958 P.2d 273 (1998)
135 Wash.2d 678
John WEDEN II; John Pfarr and Jamie Pfarr, d/b/a Zzoomers Scooters and Bikes, d/b/a Zzoomers II Wave Venture Tours; Skagityamkaw, Inc., a Washington corporation, d/b/a Skagit Valley Yamaha/Kawasaki; William Cameron; Timothy Fischer; Brian Marble; Ryan Harris; Leonard Moen and Lillian Sigle Moen, D.V.M.; National Marine Manufactures Association on behalf of the Personal Watercraft Industry Association; and The Port of Lopez, Respondents,
v.
SAN JUAN COUNTY acting through its Board Of Commissioners, its County Parks And Recreation Board, and its Superintendent Of Parks And Recreation, Appellants.
No. 64776-3.
Supreme Court of Washington, En Banc.
July 9, 1998.
Reconsideration Denied September 11, 1998.
*275 John Arum, Seattle, for Amicus Washington Environmental Council and Olympic Park Associates.
*276 Rachael Paschal, Michele Osborne, Seattle, for Amicus Center for Environmental Law & Policy.
Joseph Coniff, Olympia, for Amicus Northwest Marine Trade Association.
Randall K. Gaylord, Friday Harbor, Brett & Daugert, Philip Buri, Rand Jack, Bellingham, George Van Cleve, Washington, DC, for Appellants San Juan County, et al.
Williams, Kastner & Gibbs, Jeffrey Johnson, Dennis Reynolds, Margaret Sundberg, Seattle, Christopher Hodgkin, Friday Harbor, for Respondents John Weden, et al.
*274 JOHNSON, Justice.
In January 1996, San Juan County passed an ordinance that banned the use of motorized personal watercraft, subject to certain limited exceptions, on all marine waters and one lake in that county. We are asked to determine whether that ordinance is unconstitutional or violative of the public trust doctrine. We conclude that it is neither and, consequently, reverse the Whatcom County Superior Court's judgment that the Ordinance is void and of no force and effect and remand for entry of an order granting San Juan County's motion for summary judgment.

FACTS
The Board of Commissioners of San Juan County (Board) held public meetings on September 18 and 19, 1995, for the purpose of discussing what some citizens had identified as a growing problem with the use of motorized personal watercraft (PWC) in San Juan County waters.[1] Following those meetings, the Board conducted a workshop with the San Juan County Prosecuting Attorney "regarding drafting of proposed regulations regarding the use of Personal Watercraft in San Juan County...." Ex. 249, at 2 (Ordinance No. 3-1996). On January 23, 1996, the Board conducted a public meeting on a proposed ordinance that was developed at the workshop. One week later, the Board adopted Ordinance No. 3-1996 (the Ordinance). The Ordinance prohibits the operation of PWC on all marine waters of San Juan County, except:
a. During such time that the Personal Water Craft is being used for or engaged in interstate or foreign commerce; and that during such use the Personal Water Craft is following the most direct route practicable;
b. During such time that Personal Water Craft are operating under a permit issued by San Juan County or a United States Coast Guard Permit;
c. For emergency purposes when there is a reasonable belief that such use is necessary to protect persons, animals or property.
Ex. 249, at 12-13 (Ordinance No. 3-1996, § 5). The Ordinance also banned the use of PWC outright on Sportsman Lake in San Juan County.
A personal watercraft is defined in the Ordinance as "a vessel of less than sixteen feet (16') in length that is propelled by machinery, commonly a jet pump, and which is designed to be operated by a person sitting, standing or kneeling on the vessel, rather tha[n] being operated by a person sitting or standing inside the vessel." Ex. 249, at 12 (Ordinance No. 3-1996, § 3). The Ordinance provides that it will expire two years from the date of enactment unless otherwise extended.[2]
The Ordinance contained an extensive list of "legislative findings" regarding the nature of the marine environment in San Juan County and the characteristics of PWC. Regarding the marine environment, the Ordinance states:
7. The marine waters of San Juan County has [sic] many species of threatened *277 and endangered species of marine mammals and birds as visitors, migrants or residents that are sensitive to vessel traffic in and among the San Juan Islands....
. . . .
9. The refuges and other protected areas offer habitat [where] birds nest and rest and seals rest and nurture their young. Birds disturbed or panicked by vessels trample eggs and chicks, knock chicks from nests onto waves and rocks, and expose vulnerable offspring to sun, rain, and predators. Newborn seal pups may become separated from their mothers, crushed by a herd of panicked adults or be forced into cold or swift water prematurely. If the disturbances are continued entire refuge areas may be abandoned by wildlife.
Ex. 249, at 4-5 (Ordinance No. 3-1996). The Board also noted that tourism, which is a "major economic factor" in San Juan County, is "heavily dependent" on visitors who seek "tranquillity" and the opportunity "to view marine life and habitat." Ex. 249, at 6 (Ordinance No. 3-1996). It made no findings specifically relating to the use of PWC on Sportsman Lake.
The Board's findings in reference to PWC were as follows:
17. PWCs are capable of high speeds, up to 60 MPH, have a high degree of maneuverability. Operation typically includes rapid changes of direction, rare travel in straight lines, and frequent operation in multiple numbers in a confined area. Operators are expected [to] be in contact with the water either by spray or falling overboard. PWCs are small and have a shallow draft which allows them to be operated at high speeds close to shore.
18. The high speed of a PWC, the rapidity with which it can change direction and the waves and noise it produces cause disruption to other vessels, swimmers and divers and the natural environment. If the operators violate the law, they are almost impossible to apprehend because of the high speed and high maneuverability. Because they rarely travel in straight lines, the vessel speed cannot be easily determined.
Ex. 249, at 8 (Ordinance No. 3-1996).
The Ordinance enumerates multiple effects of PWC about which the Board was concerned:
19. The noise from PWCs interferes with the historical and current uses and enjoyment of the shoreline property. Although unmodified PWC are no louder than other types of boats, modifications to PWCs are more common than other vessels. PWCs commonly operate with other PWCs close together for reasons of safety, fun and convenience. As a general rule, additional PWCs operated in the same area will cause the overall noise level to increase. PWC, frequently operate in a small area causing conflict with shoreline users. Finally, part of the fun of PWC use is rapid acceleration, deceleration and the jumping of wakes. These operations create an uneven noise, that is louder when the PWC is out of the water, that is objectionable and has been compared in pitch to the sound of a mosquito. These characteristics are not shared by other vessels operated to reach a destination.
20. The operational characteristics of PWCs make them hazardous and incompatible with destination commercial and recreational vessel traffic in and through San Juan County. The maneuverability and ability to travel close to shore of PWCs make them able to harass wildlife and bird life unlike destination power vessels. These attributes are also inconsistent with the protection and preservation of the wildlife which inhabit the waters and refuges of the County. These attributes are also inconsistent with the tranquil lifestyle quality desired by the tourists and residents of the County.
21. The operation of PWCs is less safe and more damaging in San Juan County marine waterways than in other waters because of cold water temperatures, changeable and unpredictable currents, variable tidal heights exposing rocks at different times, floating deadheads, rocks and reefs, and populations of marine life.

*278 22. Accident statistics for PWCs is not yet available for San Juan County, largely because PWC use is only emerging. The evidence from other larger communities where PWC is more established is helpful, however. A report entitled "California Boating Accident Report for 1994" showed that Personal Water Craft made up 13.1 percent of the boating industry, but were involved in 36 percent of all reported boating accidents, 46 percent of the injuries and 17.5 percent of the fatalities and 17 percent of the property damage.
. . . .
24. The high-speed, high-pitched sound, and ability to operate close to shore are characteristics that are unique to PWCs. While the effect of such operation on marine life in San Juan County is unknown, it cannot be beneficial and appear [sic] most likely to be deleterious. Although most wildlife is believed to be quick enough to avoid collisions with powerboats, it is unknown whether all marine life of San Juan County can react quickly enough to avoid PWCs. Without additional evidence to support the safety of PWCs, and given the harmful impact that could result to the County from destruction of its marine life it is found that the best policy is one of "prudent avoidance" and prohibition of PWCs within San Juan County.
. . . .
25. The Washington State Legislature has enacted regulations regarding the operation of PWCs, which are inadequate for the unique conditions in San Juan County....
. . . .
27. Although noise is regulated by RCW 88.12.085, that regulation does not address the cumulative noise of vessels operating in the same area, the annoying impact of vessels that are not destination-bound, and other noise characteristics unique to PWCs.
Ex. 249, at 8-11 (Ordinance No. 3-1996).
Shortly after the Board enacted the Ordinance, a group of PWC users, PWC rental and sales businesses, and a PWC industry association (Respondents), brought suit against San Juan County in Whatcom County Superior Court.[3] In their suit they sought a declaratory judgment that "Ordinance 3-1996 is illegal, void and of no force or effect." Clerk's Papers (CP) at 2227. They alleged that the Ordinance violates article XI, section 11 of the Washington Constitution because it conflicts with state vessel registration and safety laws, as well as various other general state laws. Respondents also alleged that the Ordinance violates their right to substantive due process, is unconstitutionally vague, and is violative of the public trust doctrine.
San Juan County moved for summary judgment, claiming the Ordinance "is a valid exercise of the police power." CP at 2190. Respondents subsequently filed multiple cross motions for summary judgment on various grounds.[4] Following a hearing on the summary judgment motions, the trial court concluded the Ordinance "is in conflict with general laws of the state legislature, including the Recreational Vessel Registration Law, RCW Ch. 88.02" and, thus, violates Wash. Const. art. XI, §11. CP at 13-14. The court thereafter entered an order denying San Juan County's motion for summary judgment and granting Respondents' motion with respect to their "conflict with general laws" argument. CP at 13. The court denied the motion in respect to Respondents' vagueness argument. The trial court also issued a judgment declaring the Ordinance "invalid, unconstitutional, void and of no *279 force and effect" and enjoining the County from enforcing the Ordinance. CP at 18. The County sought direct review in this court of the trial court's judgment and its order granting summary judgment. Respondents filed a notice of cross appeal of the trial court's order denying their motion with respect to the vagueness challenge. We granted direct review.

ANALYSIS
This court reviews an order granting summary judgment de novo, engaging in the same inquiry as the trial court. Greaves v. Medical Imaging Sys., Inc., 124 Wash.2d 389, 392, 879 P.2d 276 (1994). An order granting summary judgment is appropriate only if "the pleadings, affidavits, depositions, admissions and all reasonable inferences drawn therefrom in favor of the nonmoving party" demonstrate there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Higgins v. Stafford, 123 Wash.2d 160, 169, 866 P.2d 31 (1994) (quoting Peterick v. State, 22 Wash.App. 163, 180, 589 P.2d 250 (1977), overruled on other grounds by Stenberg v. Pacific Power & Light Co., 104 Wash.2d 710, 709 P.2d 793 (1985)); see also CR 56(c). "[R]egularly enacted ordinance[s] will be presumed to be constitutional," Homes Unlimited, Inc. v. City of Seattle, 90 Wash.2d 154, 158, 579 P.2d 1331 (1978), unless the statute involves a fundamental right or a suspect class, in which case the presumption is reversed. City of Mobile v. Bolden, 446 U.S. 55, 100 S.Ct. 1490, 100 S.Ct. 1519, 64 L.Ed.2d 47 (1980); State v. Conifer Enters., Inc., 82 Wash.2d 94, 508 P.2d 149 (1973). Robert F. Utter, Freedom and Diversity in a Federal System: Perspectives on State Constitutions and the Washington Declaration of Rights, 7 U. PUGET SOUND L.REV. 491, 508 (1984).
The appeal presents four issues: whether the Ordinance (1) conflicts with chapter 88.02 RCW or various other "general laws" such that it violates article XI, section 11 of the Washington Constitution; (2) is an unreasonable exercise of San Juan County's police power; (3) is violative of substantive due process; or (4) is unconstitutionally vague.

Article XI, Section 11Police Power
Article XI, section 11 of the Washington Constitution provides that "[a]ny county, city, town or township may make and enforce within its limits all such local police, sanitary and other regulations as are not in conflict with general laws." Regarding this "constitutional grant of authority," we stated in Hass v. City of Kirkland, 78 Wash.2d 929, 481 P.2d 9 (1971):
This is a direct delegation of the police power as ample within its limits as that possessed by the legislature itself. It requires no legislative sanction for its exercise so long as the subject-matter is local, and the regulation reasonable and consistent with the general laws. Hass, 78 Wash.2d at 932, 481 P.2d 9 (quoting Detamore v. Hindley, 83 Wash. 322, 326, 145 P. 462 (1915)). While there are limits to the police power, the use of police power by government allows the Legislature to enact laws in the interest of the people. As described in Lawton v. Steele, 152 U.S. 133, 14 S.Ct. 499, 38 L.Ed. 385 (1894), the police power is vast:
The extent and limits of what is known as the `police power' have been a fruitful subject of discussion in the appellate courts of nearly every State in the Union. It is universally conceded to include everything essential to the public safety, health, and morals, and to justify the destruction or abatement, by summary proceedings, of whatever may be regarded as a public nuisance. Under this power it has been held that the State may order the destruction of a house falling to decay or otherwise endangering the lives of passers-by; the demolition of such as are in the path of a conflagration; the slaughter of diseased cattle; the destruction of decayed or unwholesome food; the prohibition of wooden buildings in cities; the regulation of railways and other means of public conveyance, and of interments in burial grounds; the restriction of objectionable trades to certain localities; the compulsory vaccination of children; the confinement of the insane or those afflicted with contagious diseases; the restraint of vagrants, beggars, and habitual drunkards; *280 the suppression of obscene publications and houses of ill fame; and the prohibition of gambling houses and places where intoxicating liquors are sold. Beyond this, however, the State may interfere wherever the public interests demand it, and in this particular a large discretion is necessarily vested in the legislature to determine, not only what the interests of the public require, but what measures are necessary for the protection of such interests. To justify the State in thus interposing its authority in behalf of the public, it must appear, first, that the interests of the public generally, as distinguished from those of a particular class, require such interference; and, second, that the means are reasonably necessary for the accomplishment of the purpose, and not unduly oppressive upon individuals. The legislature may not, under the guise of protecting the public interests, arbitrarily interfere with private business, or impose unusual and unnecessary restrictions upon lawful occupations. In other words, its determination as to what is a proper exercise of its police powers is not final or conclusive, but is subject to the supervision of the courts.
Lawton, 152 U.S. at 136-37, 14 S.Ct. 499 (emphasis added) (citations omitted). The above quoted language was adopted by City of Seattle v. Ford, 144 Wash. 107, 111-12, 257 P. 243 (1927). We have endorsed a similarly expansive view of the meaning of police power:
[Police power] is defined by the supreme court of Illinois, in the case of Lake View v. Rose Hill Cemetery, 70 Ill. 191, as 
"That inherent and plenary power in the state which enables it to prohibit all things hurtful to the comfort, safety and welfare of society."
Many definitions have been announced by the courts, but the above, it seems to us, is so terse and comprehensive that we need look no farther for a definition.
State v. Carey, 4 Wash. 424, 427-28, 30 P. 729 (1892). The police power is firmly rooted in the history of this state, and its scope has not declined. In Covell v. City of Seattle, 127 Wash.2d 874, 905 P.2d 324 (1995), we reiterated, "[m]unicipal police power is as extensive as that of the legislature, so long as the subject matter is local and the regulation does not conflict with general laws.... The scope of police power is broad, encompassing all those measures which bear a reasonable and substantial relation to promotion of the general welfare of the people." Covell, 127 Wash.2d at 878, 905 P.2d 324 (quoting Hillis Homes, Inc. v. Snohomish County, 97 Wash.2d 804, 808, 650 P.2d 193 (1982) (quoting State v. City of Seattle, 94 Wash.2d 162, 165, 615 P.2d 461 (1980))).
We will find the Ordinance consistent with article XI, section 11 of the state constitution unless: (1) the Ordinance conflicts with some general law; (2) the Ordinance is not a reasonable exercise of the County's police power; or (3) the subject matter of the Ordinance is not local. Whether an ordinance is reasonable, local, or conflicts with a general law for purposes of article XI, section 11 is purely a question of law subject to de novo review. See City of Seattle v. Williams, 128 Wash.2d 341, 346-47, 908 P.2d 359 (1995); cf. Washam v. Sonntag, 74 Wash.App. 504, 507, 874 P.2d 188 (1994) (addressing whether statute violates state constitution as issue of law subject to de novo review). In this case, Respondents bear the burden of persuasion.
A. Conflict with General Laws
Article XI, section 11 requires a local law yield to a state statute on the same subject matter if that statute "preempts the field, leaving no room for concurrent jurisdiction," or "if a conflict exists such that the two cannot be harmonized." Brown v. City of Yakima, 116 Wash.2d 556, 559, 561, 807 P.2d 353 (1991). Respondents do not argue that the Legislature has preempted the field of conduct governed by the Ordinance but, rather, contend the Ordinance conflicts with various state laws.
`"In determining whether an ordinance is in `conflict' with general laws, the test is whether the ordinance permits or licenses that which the statute forbids and prohibits, and vice versa." Village of Struthers v. Sokol, 108 Ohio St. 263, 140 N.E. 519 [(1923) ]. Judged by such a test, an ordinance *281 is in conflict if it forbids that which the statute permits,' State v. Carran, 133 Ohio St. 50, 11 N.E.2d 245, 246 [ (1937) ].
City of Bellingham v. Schampera, 57 Wash.2d 106, 111, 356 P.2d 292, 92 A.L.R.2d 192 (1960). An ordinance must yield to state law only "if a conflict exists such that the two cannot be harmonized." Brown, 116 Wash.2d at 561, 807 P.2d 353; accord Schampera, 57 Wash.2d at 111, 356 P.2d 292 ("Unless legislative provisions are contradictory in the sense that they cannot coexist, they are not to be deemed inconsistent because of mere lack of uniformity in detail. Bodkin v. State, [132 Neb. 535], 272 N.W. 547 [ (1937) ]."). In this case, we must examine whether the Ordinance conflicts with chapter 88.02 RCW, chapter 88.12 RCW, chapter 90.58 RCW, chapter 43.99 RCW, or the public trust doctrine.
The trial court found the Ordinance conflicted with chapter 88.02 RCW, the state vessel registration statute. In essence, the trial court found that the Ordinance forbid an activity the statute impliedly allowed.
We have previously addressed a similar argument and established an analysis to be followed. In State ex rel. Schillberg v. Everett Dist. Justice Court, 92 Wash.2d 106, 594 P.2d 448 (1979), we reviewed a Snohomish County ordinance that prohibited the use of internal combustion motors on "certain lakes" in Snohomish County. Schillberg, 92 Wash.2d at 107, 594 P.2d 448. A person charged with violating the statute challenged the law "on the ground that it conflict[ed] with [chapter 88.12 RCW]." Schillberg, 92 Wash.2d at 107, 594 P.2d 448. We found no conflict and stated:
The provisions of [chapter 88.12 RCW] are concerned with safe operation of motor boats and do not in any way grant permission to operate boats in any place. A statute will not be construed as taking away the power of a municipality to legislate unless this intent is clearly and expressly stated....
There being no express statement nor words from which it could be fairly inferred that motor boats are permitted on all waters of the state, no conflict exists and the ordinance is valid.
Schillberg, 92 Wash.2d at 108, 594 P.2d 448 (citations omitted). Schillberg certainly lays to rest any claim that the Ordinance conflicts with chapter 88.12 RCW. However, we hold Schillberg controls the discussion of whether the Ordinance conflicts with the state's vessel registration statute, chapter 88.02 RCW.
The Legislature did not enact chapter 88.02 RCW to grant PWC owners the right to operate their PWC anywhere in the state. The statute was enacted to raise tax revenues and to create a title system for boats. See RCW 88.02.120. RCW 88.02.020 provides, in pertinent part: "Except as provided in this chapter, no person may own or operate any vessel on the waters of this state unless the vessel has been registered and displays a registration number and a valid decal in accordance with this chapter...."[5] On its face, the statute prohibits operation of an unregistered vessel. Nowhere in the language of the statute can it be suggested that the statute creates an unabridged right to operate PWC in all waters throughout the state.
Registration of a vessel is nothing more than a precondition to operating a boat. No unconditional right is granted by obtaining such registration. Statutes often impose preconditions which do not grant unrestricted permission to participate in an activity. Purchasing a hunting license is a precondition to hunting, but the license certainly does not allow hunting of endangered species, RCW 77.16.120, or hunting inside the Seattle city limits, see Seattle Municipal Code 12A.14.071 (banning discharge of a firearm). Reaching the age of 16 is a precondition to driving a car, but reaching 16 does not create an unrestricted right to drive a car however and wherever one desires.
Schillberg states that the Legislature must expressly indicate an intent to preempt a particular field. In this case, the registration statute does not contain language preempting the regulation of this activity to the State. See RCW 46.08.020. We "will not interpret a statute to deprive a *282 municipality of the power to legislate on particular subjects unless that clearly is the legislative intent." Southwick, Inc. v. City of Lacey, 58 Wash.App. 886, 891-92, 795 P.2d 712 (1990). The San Juan County Ordinance does not conflict with the state's vessel registration statute; it is a routine application of the police power.
The Ordinance does not conflict with other statewide statutes and laws, specifically chapter 90.58 RCW, chapter 43.99 RCW, and the public trust doctrine. Although the trial court found it unnecessary to address these issues, the parties have thoroughly briefed and argued these issues, and "[w]e may affirm or reverse the summary judgment of the trial court based on our own resolution of the constitutional issues." Washington Ass'n of Child Care Agencies v. Thompson, 34 Wash.App. 225, 230, 660 P.2d 1124 (1983) (citing Simpson v. State, 26 Wash.App. 687, 615 P.2d 1297 (1980)).
The waters of San Juan County are among those regulated by the Shoreline Management Act of 1971(SMA), chapter 90.58 RCW. However, banning the use of PWC is consistent with the aims of that chapter. Our conclusion is supported by a policy statement in the SMA, which provides in part:
It is the policy of the state to provide for the management of the shorelines of the state by planning for and fostering all reasonable and appropriate uses. This policy is designed to insure the development of these shorelines in a manner which, while allowing for limited reduction of rights of the public in the navigable waters, will promote and enhance the public interest. This policy contemplates protecting against adverse effects to the public health, the land and its vegetation and wildlife, and the waters of the state and their aquatic life, while protecting generally public rights of navigation and corollary rights incidental thereto.
The legislature declares that the interest of all of the people shall be paramount in the management of shorelines of state-wide significance.
RCW 90.58.020 (emphasis added). The ban of a certain type of activity is consistent with the "limited reduction of rights" allowed by the statute. Moreover, there is additional language in RCW 90.58.020:
The department, in adopting guidelines for shorelines of state-wide significance, and local government, in developing master programs for shorelines of state-wide significance, shall give preference to uses in the following order of preference which:
(1) Recognize and protect the state-wide interest over local interest;
(2) Preserve the natural character of the shoreline;
(3) Result in long term over short term benefit;
(4) Protect the resources and ecology of the shoreline;
(5) Increase public access to publicly owned areas of the shorelines;
(6) Increase recreational opportunities for the public in the shoreline.
Here, the Board concluded that "[t]he maneuverability and ability to travel close to shore of PWCs make them able to harass wildlife and bird life unlike destination power vessels." Ex. 249, at 9 (Ordinance No. 3-1996). It also found that such attributes of PWC are "inconsistent with the protection and preservation of the wildlife which inhabit the waters and refuges of the County." Ex. 249, at 8-11 (Ordinance No. 3-1996). Thus, the Ordinance appropriately favors "the resources and ecology of the shoreline" over recreational interests, RCW 90.58.020, and is consistent with the statute's purposes.
The Ordinance does not conflict with chapter 43.99 RCW, the Marine Recreation Land Act of 1964, and its implementing regulations, which are set forth in Title 286 of the Washington Administrative Code. In enacting RCW 43.99.110, the Legislature created the interagency committee for outdoor recreation (IAC) for the purpose of expending the portion of unreclaimed fuel taxes paid by boaters to "aqui[re] or improve[] marine recreation land on the ... fresh and salt waters of the state." RCW 43.99.010(2) (summarizing "mission" of IAC). According to Respondents, because the County has received substantial funds from the IAC, it must keep facilities open to "all motorized vessels." See Br. of Resp'ts at 55-56 (citing *283 CP at 1759-71; CP at 1133-36) (IAC Guidelines § 4.08(15)(A-D)). The document that Respondents cite as support for this proposition is an agreement accompanying a project grant from the IAC to the Washington State Parks and Recreation Commission for the purpose of developing boating facilities in San Juan County. Although the agreement states that all facilities covered by it "shall be kept open for public use at reasonable hours and times of the year," it contains no language indicating that the County may not otherwise restrict the manner in which the public uses the facilities. CP at 1763. Moreover, the agreement provides that subject facilities are to be operated "in accordance with all applicable ... local laws and regulations." CP at 1763. We do not find the Ordinance inconsistent with this agreement.
Since as early as 1821, the public trust doctrine has been applied throughout the United States "as a flexible method for judicial protection of public interests in coastal lands and waters." Ralph W. Johnson et al., The Public Trust Doctrine and Coastal Zone Management in Washington State, 67 WASH. L. REV. 521, 524 (1992). The doctrine protects "public ownership interests in certain uses of navigable waters and underlying lands, including navigation, commerce, fisheries, recreation, and environmental quality." Johnson, supra, at 524. The doctrine reserves a public property interest, the jus publicum, in tidelands and the waters flowing over them, despite the sale of these lands into private ownership. Johnson, supra, at 524. "The state can no more convey or give away this jus publicum interest than it can `abdicate its police powers in the administration of government and the preservation of the peace.'" Caminiti v. Boyle, 107 Wash.2d 662, 669, 732 P.2d 989 (1987) (quoting Illinois Cent. R.R. v. Illinois, 146 U.S. 387, 453, 13 S.Ct. 110, 36 L.Ed. 1018 (1892), aff'd, 154 U.S. 225, 14 S.Ct. 1015, 38 L.Ed. 971 (1894)). Due to the "universally recognized need to protect public access to and use of such unique resources as navigable waters, beds, and adjacent lands," courts review legislation under the public trust doctrine with a heightened degree of judicial scrutiny, "as if they were measuring that legislation against constitutional protections." Johnson, supra, at 525, 526-27.
This court did not expressly adopt the public trust doctrine until 1987, but indicated then that the doctrine has always existed in Washington law. See Caminiti, 107 Wash.2d at 669-70, 732 P.2d 989. The doctrine in Washington "prohibits the State from disposing of its interest in the waters of the state in such a way that the public's right of access is substantially impaired, unless the action promotes the overall interests of the public." Rettkowski v. Department of Ecology, 122 Wash.2d 219, 232, 858 P.2d 232 (1993).
The test of whether or not an exercise of legislative power with respect to tidelands and shorelands violates the `public trust doctrine' is found in the following language of the United States Supreme Court:
The control of the State for the purposes of the trust can never be lost, except as to such parcels as are used in promoting the interests of the public therein, or can be disposed of without any substantial impairment of the public interest in the lands and waters remaining.
Accordingly, we must inquire as to: (1) whether the State, by the questioned legislation, has given up its right of control over the jus publicum and (2) if so, whether by so doing the State (a) has promoted the interests of the public in the jus publicum, or (b) has not substantially impaired it.
Caminiti, 107 Wash.2d at 670, 732 P.2d 989 (quoting in part Illinois Cent. R.R., 146 U.S. at 453, 13 S.Ct. 110) (footnote omitted).
We have previously acknowledged that the jus publicum interest encompasses the "rights of fishing, boating, swimming, water skiing, and other related recreational purposes generally regarded as corollary to the right of navigation and the use of public waters." Caminiti, 107 Wash.2d at 669, 732 P.2d 989 (emphasis added) (citing Wilbour v. Gallagher, 77 Wash.2d 306, 316, 462 P.2d 232, 40 A.L.R.3d 760 (1969)). Nevertheless, we agree with the County that the Ordinance does not violate the public trust doctrine because the County has not given up its right of control over its waters. Although the Ordinance prohibits a particular form of recreation, *284 the waters are open to access by the entire public, including owners of PWC who utilize some other method of recreation.
While the Ordinance governs activities more appropriate for general state legislation, the State has failed to act. The San Juan County Ordinance cannot conflict with state laws that do not exist. Further, the Ordinance is consistent with the goals of statewide environmental protection statutes. Finally, it would be an odd use of the public trust doctrine to sanction an activity that actually harms and damages the waters and wildlife of this state.
B. Reasonable Exercise of Police Power
The Ordinance must be a "reasonable" exercise of the County's police power in order to pass muster under article XI, section 11 of the state constitution. City of Seattle v. Montana, 129 Wash.2d 583, 591, 919 P.2d 1218 (1996). "A law is a reasonable regulation if it promotes public safety, health or welfare and bears a reasonable and substantial relation to accomplishing the purpose pursued." Montana, 129 Wash.2d at 592, 919 P.2d 1218; accord Thurston County Rental Owners Ass'n v. Thurston County, 85 Wash.App. 171, 181, 931 P.2d 208, review denied, 132 Wash.2d 1010, 940 P.2d 655 (1997). "[T]he wisdom, necessity and expediency of the law are not for judicial determination," and an enactment may not be struck down as beyond the police power unless it "is shown to be clearly unreasonable, arbitrary or capricious." Homes Unlimited, Inc. v. City of Seattle, 90 Wash.2d 154, 159, 579 P.2d 1331 (1978).
In State ex rel. Faulk v. CSG Job Ctr., 117 Wash.2d 493, 816 P.2d 725 (1991), we announced a two-part test to be employed when determining the validity of a statute passed pursuant to the police power. First, the statute must promote the health, safety, peace, education, or welfare of the people. CSG Job Ctr., 117 Wash.2d at 504, 816 P.2d 725. Second, the requirements of the statute must bear some reasonable relationship to accomplishing the purpose underlying the statute. CSG Job Ctr., 117 Wash.2d at 504, 816 P.2d 725.
The Ordinance indicates the ban on PWC is intended to prevent "disruption to other vessels, swimmers and divers and the natural environment," prevent interference "with the historical and current uses and enjoyment of the shoreline property," ensure the safety of "destination commercial and recreational vessel traffic," protect "wildlife and bird life," and further the tourism-based economy. See Ex. 249, at 8, 9 (Ordinance No. 3-1996). The plain language of article XI, section 11, which provides that counties may enact laws to promote "peace," and "safety," encompasses two of the objectives enumerated above.
In State v. Satiacum, 50 Wash.2d 513, 520, 314 P.2d 400 (1957), we recognized that a "plenary right" is vested in the state under its police power to enact general laws for "regulation and conservation of wildlife." Similarly, we found in CLEAN v. State, 130 Wash.2d 782, 806, 928 P.2d 1054 (1996), that the Legislature was within its purview in enacting legislation to "improve[ ] the economy of the state ... and enhance[ ] the fabric of life." Thus, the ban does promote the purpose of the underlying statute.
Once an ordinance is found to serve a "legitimate public purpose," we examine whether the Ordinance uses "means that are reasonably necessary to achieve that purpose." Rivett v. City of Tacoma, 123 Wash.2d 573, 581, 870 P.2d 299 (1994) (quoting Presbytery of Seattle v. King County, 114 Wash.2d 320, 330, 787 P.2d 907 (1990)). A law must "bear[ ] a reasonable and substantial relation to"[6] or "be reasonably necessary to protect"[7] the public health, safety, morals, or general welfare.
Respondents argue that "`[c]ommunity displeasure,' `generalized complaints' or `public distaste for certain activities' cannot be the basis for governmental action." Br. of Resp'ts at 37 (citing Maranatha Mining, Inc. v. Pierce County, 59 Wash.App. 795, 804, 801 P.2d 985 (1990)). Respondents urge us to follow the reasoning of Steier v. Batavia *285 Park Dist., 283 Ill.App.3d 968, 219 Ill.Dec. 327, 670 N.E.2d 1215 (1996), appeal denied, 171 Ill.2d 586, 222 Ill.Dec. 438, 677 N.E.2d 972 (1997), in which the Illinois Court of Appeals considered whether an ordinance prohibiting PWC from using a boat launch violated language in an Army Corps of Engineers' permit under which the launch had been constructed. In concluding the ban violated the permit's requirement that the city allow "the full and free use by the public of all navigable waters at or adjacent to the [launch],"[8] the Steier court stated:
We recognize the defendant has a legitimate interest in preventing noise, wake, and wildlife problems. However, the Ordinance unreasonably singles out one type of watercraft in an effort to eliminate the deleterious effects that excessive noise and speed create. The problems of excessive noise and speed are not solely related to personal watercraft. We believe it is unreasonable to deny the use of the Batavia launch to users of personal watercraft and continue to allow all other watercraft of the same class to use the launch. Instead of singling out one type of watercraft, the defendant should enact appropriate ordinances which apply to all watercraft. The defendant has the right to regulate, but a regulation applies equally to all. Because the Ordinance singles out one type of watercraft, it is unreasonable and thus violates the permit issued by the Corps.
Steier, 283 Ill.App.3d at 974, 219 Ill.Dec. 327, 670 N.E.2d 1215 (citations omitted).
We find Steier unpersuasive. The issue there was whether the ban contradicted the Army Corps of Engineers' permit or violated a state statute that prohibited "shut[ting] off the access to any public dock or landing thereon,"[9] not whether the PWC ban was within the legislative police power. Moreover, San Juan County has determined that singling out PWC is, in fact, a logical distinction. Paragraphs 26 and 27 of the Ordinance state:
26. Existing regulations do not address the location o[r] operation of PWCs, nor do they deal with distances from machine to shoreline, speed zones, time of operation and operator safety training. The regulations also do not provide sufficient funding for enforcement, education and training. Existing laws present problems for enforcement, and create uncertainties with respect to the impact of the PWCs on marine sealife.
27. Although noise is regulated by RCW 88.12.085, that regulation does not address the cumulative noise of vessels operating in the same area, the annoying impact of vessels that are not destination-bound, and other noise characteristics unique to PWCs.
Ex. 249, at 11 (Ordinance No. 3-1996). These and other findings set forth in the Ordinance indicate that the County determined PWC are distinguishable from other vessels and that banning them was the most prudent policy in light of the concerns enumerated. We believe a determination such as this is best left to a legislative body. If we accept the Board's conclusion that PWC are inherently distinguishable from other watercraft, then it logically follows that the ban is reasonable in light of the Ordinance's purported objectives.
While replete with evidence of "displeased citizens," the record also contains evidence of problems purportedly caused by PWC, including expert testimony regarding the harm such vessels cause to the marine environment. See, e.g., Ex. 216, at 2 (Letter from Richard Osborne, Curator of Science Services, The Whale Museum) ("The ways which PWCs appear to be different from most other vessels include: 1) speed (up to 60 mph), 2) maneuverability, which facilitates erratic, unpredictable travel paths, 3) their function, or primary use, and 4) both air and underwater noise frequencies and amplitudes. All of these variables have implications in terms of their potential for impacting our water surface-dependent wildlife...."); Ex. 216, at 4 ("If PWCs were numerous in San Juan *286 County waters they would logically present a negative impact to 49 species of seasonally resident marine birds and mammals"); CP at 440 (declaration by University of Washington Zoology professor that "San Juan County's ban on jetskis will promote the health and success of the seabird populations in the area"); CP at 443, 444 (testimony of research wildlife biologist with National Oceanic and Atmospheric Administration that PWC "have a high potential for creating sounds aversive to both humans and mammals" and "pose a substantial risk of noise and visual disturbance to the marine mammals which reside in San Juan County"). In sum, we find the Ordinance serves a legitimate public purpose, is supported by evidence, and is reasonable in light of the findings.
Bans of PWC have been held reasonable in other jurisdictions. In Personal Watercraft Indus. Ass'n v. Department of Commerce, 48 F.3d 540 (D.C.Cir.1995), the court considered a National Oceanic and Atmospheric Administration (NOAA) regulation that limited the use of PWC to 14 of the 4,000-square nautical miles that compose the Monterey Bay National Marine Sanctuary. The Personal Watercraft Association had argued that treating PWC differently than all other vessels was "arbitrary and unsupported by the factual record" and, therefore, beyond the authority of NOAA, which is authorized to enact rules for the sanctuary that are "necessary and reasonable." Personal Watercraft Indus. Ass'n, 48 F.3d at 544, 546. Nevertheless, the court concluded the regulation was "not arbitrary and capricious:"
Maybe the presence of other vessels was a cause for concern; as we shall see, NOAA thought it might be. This scarcely means that NOAA had to regulate them if it was to do anything about thrill craft. An agency does not have to "make progress on every front before it can make progress on any front." United States v. Edge Broadcasting Co., [509] U.S. [418], 434, 113 S.Ct. 2696, 2707, 125 L.Ed.2d 345 (1993). Agencies often must contend with matters of degree. Regulations, in other words, are not arbitrary just because they fail to regulate everything that could be thought to pose any sort of problem.
Personal Watercraft Indus. Ass'n, 48 F.3d at 544.
Although the Board's findings here are certainly debatable, it concluded that banning PWC was necessary to further a list of public interests. Support for this conclusion was provided by the testimony of business owners, wildlife experts, and other individuals. "In determining whether ... particular legislation tends to promote the welfare of the people of the State of Washington, [the court] must presume that if a conceivable set of facts exists to justify the legislation, then those facts do exist and the legislation was passed with reference to those facts." State ex rel. Faulk v. CSG Job Ctr., 117 Wash.2d 493, 504, 816 P.2d 725 (1991) (citing State v. Conifer Enters., Inc., 82 Wash.2d 94, 97, 508 P.2d 149 (1973)).
Many times we have noted our reluctance to substitute our judgment for that of the Legislature where there is competing expert testimony in the record. See State v. Dickamore, 22 Wash.App. 851, 855, 592 P.2d 681 (1979) ("[S]o long as scientists disagree about the effect of marijuana, the legislature is free to adopt the opinions of those scientists who view marijuana as harmful. We will not substitute our judgment for that of the legislature where the statute in question bears a rational relationship to a legitimate legislative purpose."); see also CLEAN, 130 Wash.2d at 806, 815, 928 P.2d 1054. In light of the evidence supporting the Board's findings, albeit contested by Respondents and their experts, and the Board's determination that PWC possess characteristics not shared by other watercraft, we are satisfied that the Ordinance constitutes a means reasonably necessary to achieve a legitimate public purpose.
C. Local
Article XI, section 11 of the Washington Constitution is a direct delegation of the police power to cities and counties, and the power delegated is as extensive within their sphere as that possessed by the Legislature. Petstel, Inc. v. King County, 77 Wash.2d 144, 159, 459 P.2d 937 (1969). The previous discussion of police power under article XI, section 11 establishes the general *287 scope of counties' ability and authority to act. While a municipality cannot exercise its police power outside its boundaries, municipal legislation will not be found to violate the police power if its effect outside the county is only incidental. Petstel, 77 Wash.2d at 159, 459 P.2d 937. The prohibition of the use of PWC within the physical boundaries of San Juan County is purely local. The argument that the Ordinance has some tangential effects on interests or individuals lying geographically outside of San Juan County does not mean the Ordinance is not local, nor does the existence of the incidental effects provide the appropriate "test." If the test required an ordinance to only affect local residents, no ordinance could be local because all laws affect, at least to some degree, individuals visiting a county or city. A ban on hunting within a city is a valid exercise of the police power. The fact that nonresidents must comply with the law does not invalidate the law or make it "not local" for purposes of the police power. The bottom line is this PWC Ordinance only affects the type of activity allowed within the county. The Ordinance does not preclude San Juan County residents from using PWC outside the County, nor does it regulate activities beyond geographical limits. As Respondents bear the burden on this issue, we reject their assertion that the subject matter of the Ordinance is not local.

Substantive Due Process
In the final prong of our analysis, we must examine whether the Ordinance violates substantive due process. We ask whether the enactment is "unduly oppressive." This inquiry "lodges wide discretion in the court and implies a balancing of the public's interest against those of the [person regulated]." Presbytery of Seattle v. King County, 114 Wash.2d 320, 331, 787 P.2d 907 (1990). The purpose of this analysis is to prevent excessive police power regulations that would require an individual "to shoulder an economic burden, which in justice and fairness the public should rightfully bear." Orion Corp. v. State, 109 Wash.2d 621, 648-49, 747 P.2d 1062 (1987); see also Guimont v. Clarke, 121 Wash.2d 586, 610-11, 854 P.2d 1 (1993); Sintra, Inc. v. City of Seattle, 119 Wash.2d 1, 22, 829 P.2d 765 (1992); Robinson v. City of Seattle, 119 Wash.2d 34, 55, 830 P.2d 318 (1992). In Presbytery, we listed several nonexclusive factors relevant in determining whether an ordinance restricting property rights was unduly oppressive. These included "the nature of the harm sought to be avoided; the availability and effectiveness of less drastic protective measures; and the economic loss suffered by the property owner." Presbytery, 114 Wash.2d at 331, 787 P.2d 907 (citing Orion Corp., 109 Wash.2d at 655 n. 24, 747 P.2d 1062).
Applying these considerations to the Ordinance at issue here, we conclude the PWC ban is not unduly oppressive. The test simply does not apply to the present case. In Sintra, the housing preservation ordinance required developers who demolished or changed the use of low income housing to pay large fees to a city fund used to construct low income housing. The ordinance was found to be unduly oppressive because it placed upon a discrete group of individuals and developers the responsibility of solving the society-wide problem of homelessness. This was accomplished by levying exorbitant fees, even though the developers were not responsible for the problem. Sintra, 119 Wash.2d at 22, 829 P.2d 765. The PWC owners are not being forced to bear a financial burden or solve a societal problem not created by PWC. To the contrary, unlike the developers in Sintra, the PWC owners are directly responsible for the problems created by the use of their machines. It defies logic to suggest an ordinance is unduly oppressive when it only regulates the activity which is directly responsible for the harm.

Vagueness
We will hold an ordinance to be unconstitutionally vague if a challenger demonstrates the ordinance either (1) fails to define the criminal offense "with sufficient definiteness that ordinary people can understand what conduct is proscribed," or (2) does not provide "ascertainable standards of guilt to protect against arbitrary enforcement." City of Spokane v. Douglass, 115 Wash.2d 171, 178, 795 P.2d 693 (1990). The test for whether an ordinance is sufficiently definite is "common *288 intelligence" and does not "demand impossible standards of specificity." Douglass, 115 Wash.2d at 179, 795 P.2d 693. Likewise, an ordinance is not unconstitutionally vague merely because it "may require a subjective evaluation by a police officer to determine whether the enactment has been violated." Douglass, 115 Wash.2d at 181, 795 P.2d 693. "[T]he enactment is unconstitutional only if it invites an inordinate amount of police discretion." Douglass, 115 Wash.2d at 181, 795 P.2d 693.
The County contends that because Respondents' vagueness claim is a facial challenge that does not implicate their First Amendment rights, we should not even address it. "A facial vagueness challenge to an ordinance is a challenge that the terms of the ordinance `are so loose and obscure that they cannot be clearly applied in any context.'" Douglass, 115 Wash.2d at 182 n. 7, 795 P.2d 693 (quoting Basiardanes v. Galveston, 682 F.2d 1203, 1210 (5th Cir.1982)). In State v. Carver, 113 Wash.2d 591, 781 P.2d 1308, 789 P.2d 306 (1989), we noted that "[u]nless First Amendment freedoms are involved, this court generally will only determine whether a statute is unconstitutional as applied to the facts of the case." Carver, 113 Wash.2d at 599, 781 P.2d 1308, 789 P.2d 306 (emphasis added). Respondents counter that our use of the term "generally" indicates that we may, in certain situations, consider facial vagueness challenges outside of the First Amendment context. In a later case, however, we clearly rejected this proposition:
The rule regarding vagueness challenges is now well settled. Vagueness challenges to enactments which do not involve First Amendment rights are to be evaluated in light of the particular facts of each case. Consequently, when a challenged ordinance does not involve First Amendment interests, the ordinance is not properly evaluated for facial vagueness. Rather, the ordinance must be judged as applied. Accordingly, the ordinance is tested for unconstitutional vagueness by inspecting the actual conduct of the party who challenges the ordinance and not by examining hypothetical situations at the periphery of the ordinance's scope.
Douglass, 115 Wash.2d at 182-83, 795 P.2d 693 (citations omitted). Respondents have not been cited for violating the Ordinance. Thus, theirs is a facial challenge and not appropriate for consideration.
Respondents nevertheless argue that "the factual record here is sufficient to allow the Court to assess how the Ordinance has affected [R]espondents and others who lost the recreational, travel and commercial use of navigable public waters located within the County." Reply Br. of Resp'ts on Cross Appeal at 5. Respondents fail to explain, however, in what manner the record before us demonstrates that the Ordinance insufficiently describes what conduct is proscribed, or fails to provide "ascertainable standards of guilt to protect against arbitrary enforcement." Douglass, 115 Wash.2d at 178, 795 P.2d 693. To the contrary, the portions of the record that Respondents cite are declarations indicating that Respondents were in fact quite certain the PWC ban applied to them. See, e.g., CP at 1720 ("But for the ban, I would have used our personal watercraft...."); CP at 1733 ("But for the total ban during 1996, I would have used my personal watercraft in San Juan County waters...."). Respondents have not demonstrated that the Ordinance is vague as applied to them.

CONCLUSION
In sum, we conclude that the Ordinance does not conflict, for purposes of article XI, section 11 of the Washington Constitution, with RCW 88.02.020, chapter 88.12 RCW, the Marine Recreation Land Act of 1964, the Shoreline Management Act of 1971, or the public trust doctrine. The Ordinance is reasonably necessary to further the County's legitimate public purposes and not unduly oppressive; it is a reasonable exercise of the County's police power and not inconsistent with Respondents' due process rights. Finally, we are unable to consider Respondents' vagueness claim because it constitutes a facial challenge not implicating First Amendment rights.
Having concluded that the trial court erred in granting summary judgment in favor *289 of Respondents, we must next determine whether the appropriate remedy at this stage of the proceedings is reversal or remand for trial. Although the rejection of one party's cross motion for summary judgment does not compel a court to grant the opposing party's cross motion for summary judgment, we hold that to be the appropriate remedy in this case. The County moved for summary judgment on grounds that the Ordinance was a valid exercise of its police power under article XI, section 11. Having rejected Respondents' claim that the Ordinance is not local, reasonable, or related to a subject within the scope of the County's police power, we hold as a matter of law that the Ordinance is a valid exercise of the County's power enumerated in article XI, section 11 of the Washington Constitution. We will not substitute our judgment for that of a legislative body. We reverse the decision of the trial court and remand for entry of summary judgment in favor of the County on Respondents' action for declaratory judgment. The trial court's decision granting summary judgment in favor of the County on the Respondents' vagueness challenge is affirmed.
DURHAM, C.J., and DOLLIVER, SMITH, GUY, MADSEN and TALMADGE, JJ., concur.
SANDERS, Justice (dissenting).
The issue is whether a local San Juan County ordinance which absolutely prohibits state licensed and regulated motorized personal watercraft (PWC) from the state's marine waters violates Washington Constitution article XI, section 11.
As the majority recognizes (Majority at 280), this section of our constitution delegates limited legislative authority to counties for matters (1) local in nature, (2) not in conflict with the general laws, and (3) otherwise within the police power. I concur with the learned trial judge that this ordinance exceeds the constitutional grant of authority.
Washington Constitution article XI, section 11, provides:
Any county, city, town or township may make and enforce within its limits all such local police, sanitary and other regulations as are not in conflict with general laws.
As "[i]t is the function of the judiciary to test legislation against constitutional restrictions," Petstel, Inc. v. King County, 77 Wash.2d 144, 151, 459 P.2d 937 (1969), each aspect of the text tests the ordinance by a separate and independent constitutional requirement. Therefore, the failure of the ordinance to surmount any one of the three hurdles necessarily yields invalidity.

I. Subject Matter of the Ordinance is Not Local
The majority provides little analysis to support its conclusion the ordinance is "purely local":
The prohibition of the use of PWC within the physical boundaries of San Juan County is purely local.... The bottom line is this PWC Ordinance only affects the type of activity allowed within the county.
Majority at 286-287.
The majority apparently equates the term "local" with the truism that county ordinances are necessarily restricted in their reach to that which lies within the geographical boundaries of the county itself. I disagree.
Although Weden makes a strong argument that interests outside the county have been affected, the more fundamental point of disagreement is the majority's implicit assumption that ordinances which apply only within the geographical limits of a county are necessarily "purely local." Majority at 286-287. Such cannot be the rule even in theory because it is inconsistent with our State's constitutional text. Nor can it be the rule in this specific application because it ignores the physical facts and legal attributes of the marine waters of this State, as well as the state interest in the regulation of PWCsall of which speak to general, not purely local, concerns.

A. Constitutional Text: "Limits" vs. "Local"
As we have previously observed, "Appropriate constitutional analysis begins with the text and, for most purposes, should end there *290 as well." Malyon v. Pierce County, 131 Wash.2d 779, 799, 935 P.2d 1272 (1997). When construing the constitution, we are bound by the ordinary meaning of the words as they were understood on the date of popular ratification in 1889. State v. Brunn, 22 Wash.2d 120, 139, 154 P.2d 826, 157 A.L.R. 1049 (1945) (when construing the constitution it is standard practice to inquire: "What was the accepted meaning of the words used at the time the provision was adopted?"), superseded by statute as stated in State v. Jubie, 15 Wash.App. 881, 552 P.2d 196 (1976) and overruled in part on other grounds by State v. Matuszewski, 30 Wash.App. 714, 717, 637 P.2d 994 (1981); Westerman v. Cary, 125 Wash.2d 277, 288, 892 P.2d 1067 (1994) ("We will presume the language [of our constitution] carries its ordinary and popular meaning, unless shown otherwise."); Robert F. Utter, Freedom and Diversity in a Federal System: Perspectives on State Constitutions and the Washington Declaration of Rights, 7 U. Puget Sound L.Rev. 491, 511-12 (1984).
The very text of article XI, section 11, makes the critical distinction between the geographical "limits" of county legislation and the "local" nature of that legislation ("Any county ... may make and enforce within its limits all such local police ... regulations....). Const. art. XI, § 11 (emphasis added). Were we to conclude, as does the majority, "local" simply means that which is within the political boundaries of the county, the word "local" would be robbed of any meaning independent of the word "limits," rendering it superfluous. But such a construction violates the maxim which requires we give each word of the text a reasonable and independent meaning. Washington Econ. Dev. Fin. Auth. v. Grimm, 119 Wash.2d 738, 746, 837 P.2d 606 (1992) ("We have, however, consistently stated that statutes or constitutional provisions should be construed so that no clause, sentence or word shall be superfluous, void, or insignificant."). Compare Thomas M. Cooley, A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union 72 (6th ed. 1890) ("[T]he courts must ... lean in favor of a construction which will render every word operative, rather than one which may make some words idle and nugatory. This rule is applicable with special force to written constitutions, in which the people will be presumed to have expressed themselves in careful and measured terms, corresponding with the immense importance of the powers delegated, leaving as little as possible to implication.") (footnote omitted).
Indeed, on previous occasions we have recognized that just because a matter of legislative concern is situated entirely within the geographical boundaries of a local unit of government, such does not necessarily render the matter "local" in the constitutional sense. For example in Yarrow First Assocs. v. Town of Clyde Hill, 66 Wash.2d 371, 376, 403 P.2d 49 (1965), the court reversed municipal vacation of a street lying entirely within municipal boundaries, holding
[T]he residents of a particular town possess no proprietary rights to the use of its streets, in priority to or exclusion of the general public. They may not use their power to the detriment of other citizens or municipalities of the state.
Id. at 376, 403 P.2d 49. In so concluding, we reasoned "the power to regulate streets is not the power to prohibit their use by nonresidents." Id. (citations omitted). Similarly, matters of court procedure, even though limited to the geographical limits of a municipality, are "a matter of state rather than local concern." City of Spokane v. J-R Distribs., Inc., 90 Wash.2d 722, 727, 585 P.2d 784 (1978). Cf. Petstel, Inc., 77 Wash.2d at 159, 459 P.2d 937 (Local price fixing upheld because effect on business outside the county was only "incidental.").
Thus I would posit the term "local" when used in this context references not only that which is confined within the geographical limits of the political boundaries, but also connotes a qualitative interest which is of uniquely local, as distinguished from general, concern. Compare Black's Law Dictionary 938 (6th ed. 1990) ("Local. Relating to place, expressive of place; belonging or confined to a particular place. Distinguished from `general,' `personal,' `widespread,' and `transitory.'").

*291 B. Physical Facts Demonstrate Marine Waters are Not "Local"
We have long subscribed to the rule that when "[P]hysical facts are uncontroverted and speak with a force that overcomes all testimony to the contrary, reasonable minds must follow the physical facts, and therefore cannot differ." Bohnsack v. Kirkham, 72 Wash.2d 183, 190, 432 P.2d 554 (1967) (quoting Mouso v. Bellingham & N. Ry. Co., 106 Wash. 299, 303, 179 P. 848 (1919)). The physical facts of San Juan County in general, and those relevant to the application of this ordinance in particular, speak volumes about whether the subject of this ordinance is indeed "purely local."
Some geographic facts highlight the general, not local, nature of the subject. With a land mass of but 179.3 square miles and an estimated population of 12,400,[1] this county is the smallest in land area and one of the smallest in population (0.2 percent) of any county in the State. Notwithstanding, the county almost triples its area by capturing within its boundaries an additional 320 square miles of navigable waters, stretching from the Canadian border to the Strait of Juan de Fuca, adjacent to 375 miles of shoreline of "state-wide significance."[2] Clerk's Papers (CP) at 673 (Ordinance 3-1996, § 2).
The scant county population emphasizes the democratic importance we must attribute to the "local-general" dichotomy in the context of this case: To the degree this county government is representative of the interests of its county residents, it must necessarily be unrepresentative of the interests of 99.8 percent of the remaining residents of this State who have no voice whatsoever in county affairs. I submit this constitutional provision serves, at least in part, to protect all people of the State from action taken by local governments on subjects more appropriate for general state legislation.
We must also judicially notice, as an indisputable physical reality, the single most distinguishing attribute of San Juan County is the marine water within its political boundary; while recalling this water is neither restricted nor constricted by that political boundary in any manner. Unlike lakes locked within a county land mass, this water ebbs and flows with the change of the tide as it exchanges between Budd Bay near Olympia, Washington, and the Bay of Bengal off the shores of India. In physical reality, it is a highway for man and beast to travel near and far, defying all political boundaries, save and except those coincident with a shoreline quite beyond political dictation. Such marine waters are certainly not "local" in any physical sense of the word: They are transitory, ubiquitous, and simply beyond the political fiat of mortal man.

C. Public Use of These Marine Waters Not of Just Local Concern
Yet the very nature and use of these marine waters are the specific focus of the ordinance in question. The ordinance details in 27 factual findings many considerations of truly statewide, not merely local, importance. These findings include reference to the physical dimensions of the county (Finding 1); statistics regarding land mass and shoreline (Finding 2); intercounty (and international) ferry lanes (Finding 5); marine life which migrates to and from county waters and other state and international waters (Findings 6 to 7); wildlife-protected areas under state and federal jurisdiction (Finding 8); the presence of international shipping lanes within county boundaries (Finding 10);[3] recreational uses of the marine waters, including fishing, scuba diving, recreational boating, etc. (Finding 11); as well as attributes favorable to destination tourism originating from outside the county, such as marine recreation, fishing, and sightseeing, all of which make this county and its marine waters a statewide, if not national, recreational *292 destination and resource (Findings 12 through 15).
As this ordinance directly prohibits significant use of these marine waters, it is, by its terms, neither "local" in express scope nor "local" by necessary implication. The factual findings supporting this ordinance, on their face, stand in stark contradiction to the majority's conclusion that the regulation of these watercraft within county boundaries is a matter of "purely local" (Majority at 287) concern.
D. Public Trust Doctrine and Constitution Itself Mandate State Waters are State Resource for All People of the State
Discussing the public trust doctrine (Majority at 283-284), the majority correctly acknowledges the legal status of these waters as held in trust for all the people of the State, although it fails to draw the necessary legal conclusion that use of these waters, therefore, is of truly general, not merely local, concern. In this regard the majority itself recognizes the broad public interest and ownership associated with these waters by observing "`[t]he state can no more convey or give away this jus publicum interest than it can "abdicate its police powers in the administration of government and the preservation of the peace."'" Majority at 283 (quoting Caminiti v. Boyle, 107 Wash.2d 662, 669, 732 P.2d 989 (1987), cert. denied, 484 U.S. 1008, 108 S.Ct. 703, 98 L.Ed.2d 654 (1988) (citations omitted) (emphasis added)). And the majority even quotes approvingly from precedent to the effect that the public trust doctrine "`prohibits the State from disposing of its interest in the waters of the state in such a way that the public's right of access is substantially impaired...." Majority at 283 (quoting Rettkowski v. Department of Ecology, 122 Wash.2d 219, 232, 858 P.2d 232 (1993)) (emphasis added) (citations omitted). Elsewhere it acknowledges the jus publicum[4] interest encompasses the "`rights of fishing, boating, swimming, water skiing, and other related recreational purposes generally regarded as corollary to the right of navigation and the use of public waters.'" Majority at 283 (quoting Caminiti, 107 Wash.2d at 669, 732 P.2d 989). The jus publicum interest in these waters and their use is of state-wide interest to all the people of this State, not just a purely local interest to island residents.
Such considerations of generalized importance are entitled to yet added emphasis, if not prescriptive importance, according to provisions of the constitution, including article XV, which specifically require the Legislature to appoint a harbor commission and specifically enjoin the State from relinquishing any of its rights to control marine waters outside of harbors; and article XVI, section 1, which specifically provides, "All the public lands granted to the state are held in trust for all the people ...."; not to mention article XVII, section 1, which flatly mandates, "The state of Washington asserts its ownership to the beds and shores of all navigable waters in the state up to and including the line of ordinary high tide, in waters where the tide ebbs and flows...."
One would be hard pressed to imagine a more definitive and explicit declaration of public trust and generalized constitutional concern than that these marine waters are of general, not purely local, concern that represented by the public trust doctrine coupled with express provisions in the Constitution itself.
Perhaps the point would be illustrated if San Juan county were to ban all boating from its waters. The difference then between that scenario and this ordinance would be mere degree, not kind, with respect to issues of locality. Similarly, what if Pierce County closed the Narrows to pleasure boatingwould the majority opine that to be a purely local interest as welleven though the county would have cut the Sound in half politically?
This court has no prerogative to ignore the public trust doctrine or these constitutional *293 provisions because the constitution itself plainly provides, "The provisions of this Constitution are mandatory, unless by express words they are declared to be otherwise." Const. art. I, § 29. I posit the constitution itself tells us we are dealing with anything but a purely "local" subject.

E. State Statutes Dictate Marine Waters are of General, Not Purely Local, Concern
Without regard to claims of preemption, discussed under another heading, many state statutes plainly provide that the shorelines of the state, and the marine waters of the state, are of general, not just local, significance.
The Shoreline Management Act of 1971(Act), RCW 90.58, clearly references the "shorelines of the state" in the context of a statewide, general concern. By its terms this statute requires counties to propose plans for the management of their shorelines to the Department of Ecology for state-wide approval. And RCW 90.58.020 recites:
The legislature declares that the interest of all of the people shall be paramount in the management of shorelines of state-wide significance....
(Emphasis added.)
Elsewhere the Act defines the shoreline of San Juan County as a "Shoreline[ ] of state-wide significance," RCW 90.58.030(2)(e)(ii)(E)(iii) (emphasis added), and summarizes the first purpose served by the Shoreline Management Act of 1971 is to:
(1) Recognize and protect the state-wide interest over local interest;

RCW 90.58.020 (emphasis added). Yet this ordinance closes 375 miles of significant state-wide shoreline to PWCs. Is this not a matter of statewide importance?
Other statutes also reference the marine waters of the State in the context of a state-wide general, not local, concern. For example, RCW Title 75 provides for state regulation of food, fish, and shellfish and defines "State waters" as "all marine waters and fresh waters within ordinary high water lines and within the territorial boundaries of the state," RCW 75.08.011(8), and elsewhere asserts the overriding state concern to manage this resource. See, e.g., RCW 75.08.012 and.013. This statute establishes a state commission, the authority of which "extends to all areas and waters within the territorial boundaries of the state...." RCW 75.08.070. There is also a Recreational Salmon and Marine Fish Enhancement Program statute codified at RCW 75.54 with much the same provisions.
Once again, the conclusion seems inescapable that regulation of these waters is a matter of statewide concern.

F. Regulation of Power Vessels in General, and PWCs in Particular, is a Matter of Statewide Concern
This county ordinance applies directly, and almost exclusively, to the marine waters of the State and, by its terms (with few exceptions), absolutely prohibits upon those waters a certain class of vessels duly licensed by the State pursuant to RCW 88.02.020. "Personal watercraft" is expressly regulated state-wide in detail by RCW 88.12 and is specifically defined under RCW 88.12.010(15). These state regulations are uniform and general throughout the State and are not in the least "local." The regulations include requirements for mufflers and underwater exhaust systems (RCW 88.12.085), use of personal flotation devices (RCW 88.12.095), as well as various other very specific requirements relating to the operation of "personal watercraft" codified in RCW 88.12.145 (personal flotation device required, use of lanyard-type engine cutoff switch, no operation during darkness, no operation by person under 14 years of age, reckless operation prohibition, rental to person under 16 years of age prohibition, etc.).
Here it is essential to recall the ordinance in question does not merely supplement or add to these regulations, it simply prohibits any use of these personal watercraft on state waters within San Juan County's boundaries. Such a prohibition makes the state regulations utterly pointless because all such regulations are premised on the existence and operation, not prohibition, of such craft. Whether or not this ordinance is in "conflict with general laws," at an irreducible minimum it is an ordinance which deals directly, *294 forcefully, and broadly with a subject matter of intrinsically general, not just local, concern as evidenced by statewide affirmative licensure and regulation of these craft.

II. The Ordinance is in Conflict with the General Laws of the State
The trial court concluded this ordinance, which absolutely prohibits personal watercraft from the marine waters of San Juan County, conflicts with the general laws of the State and is, therefore, in excess of that legislative authority delegated to the county by constitution article XI, section 11. I agree.
A county or local ordinance conflicts with state law when it "permits or licenses that which the statute forbids and prohibits, and vice versa. Judged by such a test, an ordinance is in conflict if it forbids that which the statute permits.'" City of Bellingham v. Schampera, 57 Wash.2d 106, 111, 356 P.2d 292, 92 A.L.R.2d 192 (1960) (citations omitted). Where a state statute licenses a particular activity, counties may enact reasonable regulations of the licensed activity within their borders but they may not prohibit same outright. Compare Second Amendment Found. v. City of Renton, 35 Wash.App. 583, 589, 668 P.2d 596 (1983);[5] 6A Eugene McQuillin, The Law of Municipal Corporations § 24.54, at 150 (3d rev. ed.1997) ("that which is allowed under state law cannot be prohibited by ordinance").[6]
For example in Second Amendment Foundation the City of Renton regulated handguns in taverns and bars. In response to a challenge that the regulation of handguns conflicted with state licensing of concealed weapons, the court opined, "While an absolute and unqualified local prohibition against possession of a pistol by the holder of a state permit would conflict with state law, an ordinance which is a limited prohibition reasonably related to particular places ... is not preempted by state statute." 35 Wash.App. at 589, 668 P.2d 596.[7]
Here the State Legislature has enacted a comprehensive system of licensing and regulation of PWCs. PWCs must be registered with the State and all PWCs must display current registration decals. See RCW 88.02.020 ("[N]o person may own or operate any vessel on the waters of this state unless the vessel has been registered and displays a registration number and a valid decal in accordance with this chapter."). RCW 88.02.020 is generically a licensing provision as a license is permission "granted by some authority to do an act which, without such license, would be unlawful." Diamond Parking, Inc. v. City of Seattle, 78 Wash.2d 778, 780, 479 P.2d 47 (1971). This state statute first makes it unlawful to operate a PWC in state waters but then expressly invites same by offering a license to do exactly that. RCW 88.02.020. As the trial court correctly concluded, "When the state adopts statutes which indicate that before somebody can use a particular vessel on the navigable waters of the state that they must register that vessel[,] the corollary of that is that once registered, the state is granting a license to use *295 those on state waters." Court's Oral Decision at 4-5 (Sept. 30, 1996).
As this ordinance defeats the state license by completely banning all PWCs from the marine waters of the very county most appropriate for the very activity the State has seen fit to license, the state license is robbed of its only purpose (to allow use of the craft) as the county ordinance now renders the state permit a license to do nothing at all. One doesn't need a license for that (I hope).
In addition to licensing, state statutes provide broad statewide, uniform regulation of the design and operation of PWCs. For example, no one may operate a PWC anywhere in state waters during darkness (RCW 88.12.145(3)); nor while under age 14 (RCW 88.12.145(4)); nor without certain equipment (RCW 88.12.145(1) and .145(2)); nor recklessly (RCW 88.12.145(5)). Further, PWCs are subject to all other state marine-craft regulations including noise muffler regulations (RCW 88.12.085) and prohibitions on operation while under the influence (RCW 88.12.025).
These state statutes license and regulate the use of PWCs in Washington. Even assuming localities may further tailor or supplement state regulations, an absolute prohibition of the subject of the state regulation nullifies the very purpose of the regulation which is to affirmatively permit and tailor PWC operation, not prohibit it.[8] If a county ordinance forbids an activity which is licensed by state statute, it conflicts with the statute. Schampera, 57 Wash.2d at 111, 356 P.2d 292. This does.
This ordinance broadly bans the use of PWCs in all marine waters within the territorial boundaries of San Juan County. Such waters stretch offshore for hundreds of square miles and include international ferry lanes. There are no meaningful exceptions to the ban within the county's marine watersPWCs are prohibited everywhere. Further, the ban applies around the clock every day of the year. The ban is as absolute as absolute can be. The ordinance conflicts with RCW 88.02.020 because it prohibits that which the State allows. It therefore fails the second test under article XI, section 11, because it conflicts with the general laws.

III. Ordinance Exceeds Police Power
Article XI, section 11, substantively delegates legislative authority to local units of government to make and enforce "local police, sanitary, and other regulations...."
This ordinance is particularly susceptible to the challenge that it exceeds the legitimate scope of the police power because it is so broad and absolutely prohibitory. Were the ordinance limited in effect to specific conduct in specific areas of real concern for safety or the environment, a constitutional challenge under article XI, section 11, might be most problematic; however, to prohibit the use of personal watercraft adjacent to every square foot of 375 miles of county shoreline surrounding 172 named islands[9] for several miles offshore into and including international shipping lanes stretches the judicial test of "reasonableness" well out to sea.
The majority opines that this delegation of state authority is limited by a judicial reasonableness test. Majority at 284. Thus, by inference, it would appear to be the majority's position that the authority delegated to local units of government by article XI, section 11, to enact police regulations is either (1) absolute in scope or (2) absolute at least to the point where it deprives one of "life, liberty, or property, without due process of law." Const. art. I, § 3.[10]
*296 Although this view is not without recent precedential support,[11] and its practical effect must depend on the substantive application of article I, section 3, I posit this approach has the viscerally unsatisfactory result of denying article XI, section 11's reference to police regulations any independent textual significance. Compare Washington Econ. Dev. Fin. Auth. v. Grimm, 119 Wash.2d 738, 746, 837 P.2d 606 (1992) ("We have, however, consistently stated that statutes or constitutional provisions should be construed so that no clause, sentence or word shall be superfluous, void, or insignificant."). Given our oft-stated adherence to that self-evident rule of constitutional interpretation which requires us to construe the constitution by its ordinary language as understood at the time of its ratification, I posit the term "police ... regulation," as originally understood is a relevant subject of inquiry.

A. Original Understanding of Police Power
As evidenced by treatises, legal precedent, and complementary constitutional provisions, the original understanding of "police power" prevalent and popular at the dawn of our constitution in 1889 defined the legitimate role of the State as the protector of persons and property. This understanding is best summarized in the Latin maxim sic utere tuo ut alienum non laedas.[12] Thus "police power," as originally understood, conveyed not only a grant of authority, but its limitation as well.
Historically it must be concluded such was the understanding even prior to statehood in Washington territorial days as the Territorial Court interpreted the Organic Act which granted the territorial legislative power extending to "all rightful subjects of legislation, not inconsistent with the Constitution and laws of the United States" (9 Stat. 325, § 6 (1848)) to imply "that there are some subjects of legislation that are not rightful." Maynard v. Valentine, 2 Wash. Terr. 3, 14, 3 P. 195 (1880).[13]
Few men were closer to birth of the Washington Constitution than Theodore Lamm Stiles, first elected to serve on the Washington State Supreme Court by the same electorate which ratified the constitution itself in 1889. Justice Stiles played a leading role at the constitutional convention, chairing the committee on county, township, and municipal organizations while also serving on the rules, judiciary, and public lands committees. He soon developed "a reputation as a scholar and as the state's leading authority on the Washington Constitution." Charles H. Sheldon, The Washington High Bench: A Biographical History of the Supreme Court, 1889-1991, at 327 (1992). In an address to the Washington State Bar Association, Justice Stiles set forth, in colorful language, that founder's commitment to jealously maintain traditional limitations of police regulation against threats of radical expansion:
Laws have been passed in one state and another abridging the right of contract, the right to sell merchandise, the right to labor upon public works, the right to labor more than a certain number of hours, the right to freely come and go, the right to pursue legitimate trades, and a mass of others. Some of these laws go directly to the point, but the majority proceed by indirection. Too many succeed in evading the decree of unconstitutionality and bear oppressively on natural rights. The selfish interest of *297 classes ever anxious to push on their own fortunes, reckless of what destruction is wrought to others, is their moving cause. Legislatures, pliantly serviceable to the demands of influential cliques and unchecked by weak-kneed governors, spread them on the statute books, and there they stand, discouraging prophecies of the decadence of popular rights under democracy. They hide in swarms, behind the newly coined phrase, "police power," and that other more venerable phrase, "the public welfare," both of which, like "public policy," are often, if one may use such an expression, liveries of heaven stolen to serve the devil in.
C.S. Reinhart, History of the Supreme Court of the Territory and State of Washington 49-50 (n.d.).
A further exemplar and early explanation of the limited nature of the police power is aptly set forth in City of Seattle v. Ford, 144 Wash. 107, 111, 257 P. 243 (1927):
"It is to be observed, therefore, that the police power of the government, as understood in the constitutional law of the United States, is simply the power of government to establish provisions for the enforcement of the common as well as civil-law maxim, sic utere tuo ut alienum non laedas. ... Any law which goes beyond that principle, which undertakes to abolish rights, the exercise of which does not involve an infringement of the rights of others, or to limit the exercise of rights beyond what is necessary to provide for the public welfare and the general security, cannot be included in the police power of the government. It is a governmental usurpation, and violates the principles of abstract justice, as they have been developed under our republican institutions.
. . . .
To justify the State in thus interposing its authority in behalf of the public, it must appear, first, that the interests of the public generally, as distinguished from those of a particular class, require such interference; and, second, that the means are reasonably necessary for the accomplishment of the purpose and not unduly oppressive upon individuals.....[The Legislature's] determination as to what is a proper exercise of its police powers, is not final or conclusive, but is subject to the supervision of the courts.
Id. at 111-12, 257 P. 243 (emphasis added) (quoting Christopher G. Tiedeman, A Treatise on State and Federal Control of Persons and Property in the United States 4-5 (1900)).
Recognition of the limitation of a state's plenary police power is further evidenced in the earliest history of our nation. See, e.g., Calder v. Bull, 3 U.S. (3 Dall.) 386, 387-88, 1 L.Ed. 648 (1798) (Chase, J., seriatim) ("I cannot subscribe to the omnipotence of a state legislature, or that it is absolute and without control; although its authority should not be expressly restrained by the constitution, or fundamental law of the state.... The purposes for which men enter into society will determine the nature and terms of the social compact; and as they are the foundation of the legislative power, they will decide what are the proper objects of it.... There are acts which the federal, or state legislature cannot do, without exceeding their authority."). In fact, this recognition predates the establishment of the American Republic. Laurence H. Tribe, American Constitutional Law § 8-1, at 560 (2d ed.1988).
The majority notes that the scope of the state's police power "has not declined." Majority at 280. I would not argue with that assertion; however, the problem is more nearly the opposite. Without benefit of any formal amendment to the constitutional text, we have allowed "police power," as a substantive limitation on governmental authority, to significantly erode from its point of origin:[14] "While originally it was used as a rule to indicate the protective function of the government, its development of late years has been in the direction of the function of the state that cares for the general *298 welfare," City of Tacoma v. Boutelle, 61 Wash. 434, 443, 112 P. 661 (1911), and we have opined it "is not a rule, it is an evolution," allowing its redefinition as often as changed conditions require or compel. State v. Mountain Timber Co., 75 Wash. 581, 588, 135 P. 645 (1913), aff'd, 243 U.S. 219, 37 S.Ct. 260, 61 L.Ed. 685 (1917). Notwithstanding, we have also occasionally[15] repaired to its origin:
The germ of police power, in so far as it assumes to interfere with private rights, is to be found in the power of the state to suppress nuisances. This right was forced upon the state in the exercise of its functions, or rather duty, to preserve that equilibrium of relative right which must be preserved wherever society is organized.
Id. at 584, 135 P. 645. Such "equilibrium" is the process by which the rights of one individual are protected against the trespasses of another.
This original understanding of the "police power," as an expression of the core but limited governmental purpose and function to protect lives and property, is certainly consistent with, and confirmed by, Constitution article I, section 1, which similarly provides: "Governments ... are established to protect and maintain individual rights."
Even under the most expansive definitions of potential plenary power it is clear that where, as here, the acts of the county exceed the State's constitutional delegation the act nevertheless exceeds legitimate authority. See, e.g., United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 319-20, 57 S.Ct. 216, 81 L.Ed. 255 (1936) (noting the plenary power of the president in international relations "like every other governmental power, must be exercised in subordination to the applicable provisions of the Constitution."); Southcenter Joint Venture v. National Democratic Policy Comm., 113 Wash.2d 413, 443, 780 P.2d 1282 (1989) (State's plenary power as sovereign is limited by the state's own constitution).
Applying the principle of sic utere tuo ut alienum non laedas to the case at bar we would ask: What individual right is abridged by the continued use of personal watercraft on the marine waters of San Juan County?

B. Due Process Test
In a similar vein, the majority would ask in the name of that process which is due whether the ordinance is aimed at achieving a legitimate public purpose, whether it uses means reasonably necessary to achieve that purpose, and finally whether it is unduly oppressive upon individuals. Majority at 279-280; 286-287. Although there may be differences in outcome depending upon which of the two police power tests may be employed in any given situation, I posit this ordinance exceeds the legitimate scope of the police power under either formulation.
Such is a judicial question in at least the same sense as would be any alleged transgression of government beyond its constitutionally defined limitations. See, e.g., Marbury v. Madison, 5 U.S. 137, 176-80, 1 Cranch 137, 2 L.Ed. 60 (1803) (Marshall, C. J.).[16]

1. No Legitimate Public Purpose
I have no doubt that the use or misuse of personal watercraft is quite capable of invading private rights and public interests in a particular, as well as a global, sense under a host of imaginable circumstances. However *299 we must shape the answer to fit the parameters of the question posed by this particular ordinance.
At the threshold the court must recognize the ordinance is a two-year temporary measure passed coincident with a resolution to study the effects of personal watercraft in San Juan County. Resolution 19-1996, ex. 250. However since the ordinance constitutes a virtual prohibition of such watercraft, it seems illogical in the sense that it clears the laboratory of the very specimen alleged to be the object of study. Thus a negative inference flows that this ordinance is not based upon a demonstrable police power interest, at least one sufficiently broad in scope to justify to total prohibition, but rather a possible interest not sufficiently identified absent further study.
From this inauspicious beginning one notes the ordinance affirmatively finds that the effect of PWC "operation on marine life in San Juan County is unknown." Ordinance Finding 24. Although there is no constitutional rule which requires the ordinance to include findings, Petstel, 77 Wash.2d at 151, 459 P.2d 937, I know of no rule of law which requires us to disregard findings which have in fact been made. Certainly the majority does not. (Majority at 276-278.) I would therefore posit a demonstrably "unknown" effect on an interest of otherwise legitimate concern to the police power is no basis for its exercise.
We are then left to consider the effect of PWC operation on shoreline property owners or, possibly, other marine craft. Although these craft admittedly make noise, that noise is strictly regulated by state statute in the same manner as any other watercraft, and there is nothing in this ordinance to support discrimination between the two. Moreover, this ordinance does not purport to regulate noise. Of course, these personal watercraft might be problematic if operated adjacent to coastal residents; however, the ordinance does not prohibit only that but absolutely prohibits the operation of these craft even where there are no residents to be found and even when operated at considerable distance from shore in the most reasonable manner. Nor does the ordinance require any particular reasonable mode of operation. Its prohibitions are absolute.
Thus, I would conclude the ordinance lacks a legitimate purpose to protect a private interest, or even a public one, as I am unable to articulate one, or even imagine one, as broad in scope as is the prohibition which must be justified.
Here I must acknowledge my imagination is somewhat challenged by the perception that an exercise of the police power, to be proper, must be at least hypothetically protective of a legitimate interest. Not all interests, however, are indeed legitimate for police power purposes. For example, courts have held community displeasure cannot be a legitimate constitutional predicate for governmental action. Maranatha Mining, Inc. v. Pierce County, 59 Wash.App. 795, 804, 801 P.2d 985 (1990); Marks v. City of Chesapeake, 883 F.2d 308, 311 (4th Cir.1989) ("`[p]rivate biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect'" (citations omitted)). Cf. Anderson v. City of Issaquah, 70 Wash.App. 64, 82, 851 P.2d 744 (1993) ("[W]hether a community can exert control over design issues based solely on accepted community aesthetic values is far from `settled' in Washington case law.") (citing Polygon Corp. v. City of Seattle, 90 Wash.2d 59, 70, 578 P.2d 1309 (1978) and Duckworth v. City of Bonney Lake, 91 Wash.2d 19, 30, 586 P.2d 860 (1978)).
If the purpose of the ordinance were in reality an effort to enforce the cultural preferences of the island majority to the "quiet prosperity" (Ordinance Finding 13) of island living at the expense of the recreational preferences of those less prosperous, I would also find a paucity of legitimate police power.
Such a prohibition on this economical means of recreation brings to mind those sumptuary laws imposed on the display of a pauper's wealth during the middle ages. Such laws purported to limit extravagance in expenditures "[a]nd the common people were subjected to the control of these sumptuary laws, in order that by reducing their consumption *300 they may increase the sum of enjoyment of the privileged classes." Christopher G. Tiedeman, supra, at 187.
The existence of such laws caused Judge Cooley to remark:
[T]he ideals which suggested such laws are now exploded utterly, and no one would seriously attempt to justify them in the present age. The right of every man to do what he will with his own, not interfering with the reciprocal right of others, is accepted among the fundamentals of our law.
Thomas M. Cooley, A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union 476-77 (5th ed. 1883); Christopher G. Tiedeman, supra, at 187.
In the same vein it might well be argued this ordinance by design, or at least effect, reserves and prohibits the use of a public resource, marine waters, simply to appease the cultural or aesthetic values of the riparian landowners or interior residents. If so, such would exceed the legitimate scope of the police power, as well. If there are other legitimate police power objectives served by this ordinance, I am unenlightened by the majority opinion as to their existence.

2. Unreasonable Means
If the purpose of the ordinance is to preserve public safety, abate a nuisance, or preserve the environment, I cannot find the means employed by this ordinance reasonably necessary to accomplish its objective. If the ordinance is related to study of a possible problem with an eye toward possible future action, then I would find the prohibit-now and study-later provision irrational. If the ordinance is aimed at alleviating a problem associated with shoreline residents, then I would expect it would limit its scope, at the least, to regulation of operation close to a populated shoreline. If its purpose is to save the environment (notwithstanding an affirmative ordinance finding that the effect of PWCs on the environment is unknown), then I would expect that the ordinance would focus its regulation upon areas of particular environmental concern.
But the scope of the ordinance knows no boundaries and, concomitantly, the requirement that it promote its legitimate objectives is similarly boundless. To find this absolute sweeping ban necessary to promote a legitimate police power interest is an act of fantasy reserved for the majority.

IV. Conclusion
Thus, it is my view that this ordinance fails the constitutional test as posited by article XI, section 11, because it is not local in scope, conflicts with the general laws, and exceeds the police power as well. As this constitutional provision is as much a part of the constitution as any other, this court must yield to the constitutional mandate that "[t]he provisions of this Constitution are mandatory, unless by express words they are declared to be otherwise." Const. art. I, § 29. Therefore I dissent.
ALEXANDER, Justice (concurring in the result reached by the dissent).
I entirely agree with Justice Sanders that San Juan County's ordinance is not local in nature. Although the Legislature might well pass a statute banning personal watercraft on the waters of the state, it has not done so and it has not authorized counties to do so by ordinance. The fact that San Juan County's ordinance is not local in nature is, by itself, a sufficient basis for striking it down. Consequently, I concur in the result reached by Justice Sanders in his dissent.
NOTES
[1] The Board reported receiving a petition signed by 1,479 people requesting that PWC be banned or restricted.
[2] We recognize the Ordinance may have essentially run its course by the time this appeal is complete. If it is not reenacted, the issues before us are arguably moot. Nevertheless, we may decide a moot case if it "involves matters of continuing and substantial public interest." Dioxin/Organochlorine Ctr. v. Pollution Control Hearings Bd., 131 Wash.2d 345, 351, 932 P.2d 158 (1997) (citing In re Swanson, 115 Wash.2d 21, 24, 793 P.2d 962, 804 P.2d 1 (1990)). This is such a case.
[3] See RCW 36.01.050 ("All actions against any county may be commenced in the superior court of such county, or of the adjoining county....").
[4] See CP at 488 ("Cross-Motion for Summary Judgment Re Conflict with General Laws"); CP at 534 ("Cross-Motion for Summary Judgment Re: Invalidity of Park Ban"); CP at 554 ("Cross-Motion for Summary Judgment Re: Vagueness"). Respondents' motion regarding the park ban refers to an incident in which the County's Parks Board Superintendent, in response to a request by two of the Respondents to use a boat launch, "unilaterally decided to prohibit commercial launching of personal watercraft from all San Juan County parks." CP at 535. Pursuant to a stipulation by the parties, the trial court entered an order on November 6, 1996, invalidating the park ban. The County has not assigned error to that decision and, consequently, we do not address it here.
[5] PWC are "vessels" for purposes of chapter 88.02 RCW. See RCW 88.02.010(1).
[6] Montana, 129 Wash.2d at 592, 919 P.2d 1218.
[7] Homes Unlimited, Inc., 90 Wash.2d at 158, 579 P.2d 1331.
[8] Steier, 283 Ill.App.3d at 973, 219 Ill.Dec. 327, 670 N.E.2d 1215 (quoting conditions of permit issued by the Army Corps of Engineers).
[9] Steier, 283 Ill.App.3d at 974, 219 Ill.Dec. 327, 670 N.E.2d 1215 (quoting 70 Ill. Comp. Stat. 1205/11-5 (West 1994)).
[1] 1997 Washington State Yearbook: A Guide to Government in the Evergreen State 137.
[2] RCW 90.58.030(2)(e)(ii)(E)(iii); see discussion of Shoreline Management Act of 1971, at 14-16 ante.
[3] "There is a high volume of commercial and recreational vessels that use the marine waters of the county ranging in size from multi-ton seagoing vessels to one-person kayaks." Ordinance Finding 10.
[4] Jus publicum "implies a right in a sovereign or public capacity to be exercised for the interest or benefit of the state or the public, as distinguished from the exercise in a proprietary capacity of a right of the sovereign or a right possessed by an individual in common with the public." Black's Law Dictionary 862 (6th ed.1990) (emphasis added).
[5] See also Yarrow First Assocs. v. Town of Clyde Hill, 66 Wash.2d 371, 376, 403 P.2d 49 (1965) wherein this court struck down a town's closure of a road noting cities may regulate roads within their boundaries but may not entirely prohibit their use ("the power to regulate streets is not the power to prohibit their use"). In striking the local road closure this court noted "[e]very citizen of the state has an equal right to use the streets." Id.; cf. Allen v. City of Bellingham, 95 Wash. 12, 38, 163 P. 18 (1917) (wherein this court upheld a local ordinance regulating jitney busses because the ordinance regulated without prohibiting state licensed activity ("[T]he highways shall not be denied altogether to the use of the vehicles described.")).
[6] This principle dates back to the earliest days of statehood. See Thomas M. Cooley, A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union 741 n. 2 (6th ed. 1890) ("[I]f the municipal authority should assume to declare something which was entirely lawful by the law of the State to be a nuisance, the declaration would be a mere nullity because in conflict with the superior law.").
[7] The attorney general reached the same conclusion a year earlier noting the "distinction between the validity of (a) an absolute, unqualified, local prohibition against possession of a concealed handgun by the holder of a state concealed weapon permitat any time or place and (b) a limited prohibition related only to particular times and places. The former is invalid under state law but the latter is not." 14 Op. Att'y Gen. 8 (1982).
[8] For example, while RCW 88.12.085 requires mufflers and regulates the maximum engine noise of PWCs and other vessels, that section expressly allows a local government to enact more stringent noise regulation. RCW 88.12.085(11).
[9] See Ordinance Finding 2.
[10] Also see Majority at 279-280 "`To justify the state in thus interposing its authority in behalf of the public, it must appearFirst, that the interests of the public generally, as distinguished from those of a particular class, require such interference; and, second, that the means are reasonably necessary for the accomplishments of the purpose, and [third, that it is] not unduly oppressive upon individuals.'" (quoting Lawton v. Steele, 152 U.S. 133, 136-37, 14 S.Ct. 499, 38 L.Ed. 385 (1894)).
[11] See, e.g., CLEAN v. State, 130 Wash.2d 782, 806, 928 P.2d 1054 (1996) ("[I]t is certainly within the general police power of the State to construct a publicly owned baseball stadium.").
[12] "[O]ne should use his own property in such a manner as not to injure that of another." Black's Law Dictionary 1380 (6th ed.1990).
[13] A legislature with undefined powers has all legislative powers. It can lay down the law in every direction, moulding all persons and things, and each particular person and thing conclusively to what it says, determining absolutely and finally every question by its fiat. Its voice is the voice of the governing power, and the voice of the governing power is the voice of God. From that there is no appeal. Great Britain's Parliament is an example of such a Legislature ... American legislatures are different, simply because limited. Higher legislation than any one of them is capable of has [sic] at one breath called them into being and circumscribed their activities. The National and State legislatures have their bounds set by what the people have enacted in the National and State constitutions.

Maynard, 2 Wash. Terr. at 13-14, 3 P. 195.
[14] "What has time, what have men, done with these wonders?" Victor Hugo, The Hunchback of Notre Dame 7 (Barnes & Noble 1996).
[15] Compare, e.g., Christianson v. Snohomish Health Dist., 133 Wash.2d 647, 946 P.2d 768, 778 (1997) (Talmadge, J., concurring) ("`This does not confer power upon the whole people to control rights which are purely and exclusively private, but it does authorize the establishment of laws requiring each citizen to so conduct himself, and so use his own property, as not unnecessarily to injure another. This is the very essence of government, and has found expression in the maxim sic utere tuo ut alienum non laedas.'") (quoting Munn v. Illinois, 94 U.S. 113, 124-25, 4 Otto 113, 24 L.Ed. 77 (1876) (citation omitted)).
[16] "The powers of legislature are defined and limited; and that those limits may not be mistaken or forgotten, the constitution is written.... If an act of the legislature, repugnant to the constitution, is void, does it, notwithstanding its invalidity, bind the courts and oblige them to give it effect? Or, in other words, though it be not law, does it constitute a rule as operative as if it were a law? This would be to overthrow, in fact, what was established in theory; and would seem, at first view, an absurdity too gross to be insisted on." Marbury v. Madison, 5 U.S. 137, 176-80, 1 Cranch 137, 2 L.Ed. 60 (1803) (Marshall, C.J.)