[No. 34780-6-II. Division Two. February 24, 2009.]

KELLY SAMSON ET AL., *Appellants*, v. THE CITY OF BAINBRIDGE ISLAND ET AL., *Respondents*.

34

38

*Dennis D. Reynolds* (of *Law Office of Dennis D. Reynolds*), for appellants.

*Rosemary A. Larson* and *Rod P. Kaseguma* (of *Inslee, Best, Doezie & Ryder, PS*) and *Robert M. McKenna, Attorney General*, and *Thomas J. Young, Assistant*, for respondents.

¶1 BRIDGEWATER, J. — Kelly and Sally Samson and Robert and Joanne Hacker (collectively Samson) appeal the Central Puget Sound Growth Management Hearings Board's (Board) decision to affirm the city of Bainbridge Island's (City) amendment to the City's shoreline master program (SMP), allowing the City to prohibit construction of new single-use private docks and to limit dock construction in Blakely Harbor to two joint-use docks, one community dock, floats, and buoys.

¶2 We hold that the Department of Ecology's (Ecology) proposed guidelines, which were not in effect when the City forwarded its amendment to Ecology for review, were not applicable to the City's amendment to its SMP that Ecology examined to confirm compliance with the Shoreline Management Act of 1971 (SMA), chapter 90.58 RCW. Also, the City's amendment to its SMP prohibiting private docks in this shoreline of statewide significance is consistent with statutory guidelines because it promotes the public's ability to enjoy Blakely Harbor's aesthetic qualities and to navigate its waters. The amendment elevates the public interest over local interest and preserves the unique character of the harbor. We hold that (1) private docks in Blakely Harbor are not a preferred use, (2) the amendment is consistent with the City's SMP and comprehensive plan, and (3) the amendment does not violate the "public trust" doctrine. To the contrary, it protects the public interest in navigation and recreational use of the harbor. The amendment violates neither due process rights nor equal protection rights by treating this harbor differently from other harbors—the City still allows property owners to use floats and bulkheads, and allows two joint-use docks and a community dock. Finally, the trial court did not err in

denying the Samson's request to supplement the administrative record because the document that Samson hoped to add to the record referenced Ecology's newly adopted guidelines, which are inapplicable here. We affirm.

## FACTS

¶3 The City adopted its first SMP in 1996. Subsequently, the City studied its four major harbors and adopted a harbor management plan in 1999. Blakely Harbor is one of the City's four harbors, consisting of a coastal inlet on the island's southeast shore. Because a timber company owned most of the land surrounding Blakely Harbor for over a century, Blakely Harbor remains less developed than the rest of the City's harbors. The land surrounding this harbor has only recently become available for subdivision and residential development. With a total of six existing docks or piers, it is the last harbor in Central Puget Sound that remains largely undeveloped.

¶4 Blakely Harbor's scenic beauty, unobstructed waters, birds, sea life, and the lack of artificial light at night distinguish it from the City's other harbor areas. As such, it is attractive for transient moorage, kayaks and other hand-propelled watercraft, as well as for scuba diving, swimming, fishing, and other passive public enjoyment. Blakely Harbor is a "shoreline of statewide significance" as defined in RCW 90.58.030(2)(e)(iii) ("Those areas of Puget Sound and the Strait of Juan de Fuca and adjacent salt waters north to the Canadian line and lying seaward from the line of extreme low tide.").

¶5 On February 22, 2002, the City prepared the Blakely Harbor cumulative impact assessment (Assessment) to gauge the impact of likely build-out of piers in the harbor under various scenarios. The Assessment concluded that a predicted build-out of 45 docks would significantly affect navigability of the harbor, reduce scenic vistas, and create risk to natural resources.

¶6 Around the same time, the City developed a near-shore assessment for all of the City's marine shorelines

in response to Puget Sound Chinook salmon being listed under the Endangered Species Act of 1973, 16 U.S.C. §§ 1531-1544. The City also convened an SMP steering committee to guide its review and update of its SMP. On August 22, 2001, the City adopted Ordinance No. 2001-34, imposing an island-wide moratorium on over-water structures. The City extended this moratorium several times before it allowed the moratorium to expire for all but Blakely Harbor, which it extended until at least 2003. In 2004, we struck down the moratorium for Blakely Harbor dock applications because the SMA did not authorize the City to enact such a moratorium. *Biggers v. City of Bainbridge Island*, 124 Wn. App. 858, 865-66, 103 P.3d 244 (2004), *aff'd*, 162 Wn.2d 683, 169 P.3d 14 (2007).

¶7 While the *Biggers* case was pending, the City adopted Ordinance No. 2003-30 (amendment), amending the City's SMP by limiting dock and pier development within Blakely Harbor. The amendment prohibited single-use docks or piers in Blakely Harbor, continued to allow the use of mooring buoys and floating platforms, and allowed development of two joint-use docks for up to five boats each and one community dock. The City's goal was "to preserve the unique character, navigable waters, natural resources, and scenic beauty of the harbor and promote compatible recreational use of the harbor for the residents of Bainbridge Island and the State." 4 Administrative Record (AR) tab 41, at 2737. The City hoped to prevent the "significant cumulative loss of scenic view sheds, navigable waters, and adverse cumulative effects to water and environmental quality likely to be caused by the proliferation of private dock and pier development within Blakely Harbor." 4 AR tab 41, at 2737.

¶8 On September 25, 2003, the City forwarded its amendment to Ecology for approval. By statute, Ecology must base its review on the SMA and "applicable guide-

lines."[1] 4 AR tab 41, at 2737. The Shorelines Hearings Board held Ecology's previous master program approval guidelines invalid in 2001.[2] Ecology developed new guidelines that it filed on December 17, 2003. Accordingly, when the City submitted its amendment to Ecology on September 25, 2003, Ecology's new guidelines were not yet in effect. In the absence of applicable guidelines, Ecology reviewed the amendment under the policy of RCW 90.58.020 and the requirements of RCW 90.58.100 before approving the amendment.

¶9 On April 23, 2004, Samson filed a petition for review with the Board challenging both the City's amendment and Ecology's approval of it. Following a hearing on the merits, the Board issued its final decision and order upholding the City's amendment.

¶10 On February 15, 2005, Samson filed a petition for review under chapter 34.05 RCW, the Administrative Procedure Act (APA), with the Thurston County Superior Court. On April 17, 2006, the trial court denied Samson's request to supplement the administrative record and affirmed the Board in all respects, dismissing Samson's petition.

¶11 Samson appeals.

---

[1] RCW 90.58.080(1) provides, "Local governments shall develop or amend a master program for regulation of uses of the shorelines of the state consistent with the required elements of the guidelines adopted by [Ecology] in accordance with the schedule established by this section." RCW 90.58.090(2)(d) requires Ecology to "make written findings and conclusions regarding the consistency of the proposal with the policy of RCW 90.58.020 and the applicable guidelines."

[2] *See Ass'n of Wash. Business v. Dep't of Ecology*, No. 00-037, 2001 WL 1022097, at *16 (Wash. Shorelines Hr'gs Bd. Aug. 27, 2001):

> Chapter 173-26 WAC is deemed invalid under RCW 90.58.180(5) for (1) exceeding the statutory authority of the Shoreline Management Act by (a) implementing the Endangered Species Act (ESA), and (b) requiring conditioned letters of exemption. The guidelines are additionally deemed invalid for failure to comply with the Administrative Procedure Act requirements for public notice and comments as to (1) formal consultations towards incidental take statements under the ESA, (b) an implementation plan, (c) a cost-benefit analysis and (d) a small business economic impact statement. The guidelines are otherwise deemed valid under RCW 90.58.180(5). The guidelines are hereby remanded to the Department of Ecology for further action in accordance with RCW 90.58.180(6) and the terms of this decision.

## ANALYSIS

### STANDARD OF REVIEW

 ¶12 The APA governs judicial review of challenges to Board actions. *Quadrant Corp. v. Cent. Puget Sound Growth Mgmt. Hearings Bd.*, 154 Wn.2d 224, 233, 110 P.3d 1132 (2005). The party asserting invalidity bears the burden of establishing that invalidity. *Quadrant*, 154 Wn.2d at 233. The APA establishes nine criteria for challenging an agency's orders in adjudicative proceedings. RCW 34-.05.570(3). Samson challenges the Board's decision under RCW 34.05.570(3)(a)-(f), (h), and (i).[3] We base our review on the record before the Board. *Buechel v. Dep't of Ecology*, 125 Wn.2d 196, 202, 884 P.2d 910 (1994). We give due deference to the Board's specialized knowledge and expertise, unless there is a compelling indication that the agency's regulatory interpretation conflicts with the legislature's intent or exceeds the agency's authority. *Buechel*, 125 Wn.2d at 202-03; *see also Silverstreak, Inc. v. Dep't of Labor & Indus.*, 159 Wn.2d 868, 884, 154 P.3d 891 (2007).

---

[3] RCW 34.05.570 provides:

(3) Review of agency orders in adjudicative proceedings. The court shall grant relief from an agency order in an adjudicative proceeding only if it determines that:

(a) The order, or the statute or rule on which the order is based, is in violation of constitutional provisions on its face or as applied;

(b) The order is outside the statutory authority or jurisdiction of the agency conferred by any provision of law;

(c) The agency has engaged in unlawful procedure or decision-making process, or has failed to follow a prescribed procedure;

(d) The agency has erroneously interpreted or applied the law;

(e) The order is not supported by evidence that is substantial when viewed in light of the whole record before the court, which includes the agency record for judicial review, supplemented by any additional evidence received by the court under this chapter;

(f) The agency has not decided all issues requiring resolution by the agency;

. . . .

(h) The order is inconsistent with a rule of the agency unless the agency explains the inconsistency by stating facts and reasons to demonstrate a rational basis for inconsistency; or

(i) The order is arbitrary or capricious.

## I. Ecology's Guidelines

■■ ¶13 Samson claims that the City's amendment is invalid because Ecology failed to consider and apply its own guidelines. RCW 90.58.090(2)(d) requires Ecology to "make written findings and conclusions regarding the consistency of the proposal with the policy of RCW 90.58.020 and the *applicable* guidelines." (Emphasis added.) The Growth Management Act, chapter 36.70A RCW, also requires:

> The policies, goals, and provisions of chapter 90.58 RCW and *applicable guidelines* shall be the sole basis for determining compliance of a shoreline master program with this chapter except as the shoreline master program is required to comply with the internal consistency provisions of RCW 36.70A.070, 36.70A.040(4), 35.63.125, and 35A.63.105.

RCW 36.70A.480(3) (emphasis added). WAC 173-26--171(3)(a) provides in part:

> The policy of RCW 90.58.020 and these guidelines constitute standards and criteria to be used by the department in reviewing the adoption and amendment of local master programs under RCW 90.58.090.

¶14 Samson claims that Ecology failed to consider its own guidelines as RCW 90.58.090(2)(d) required, instead relying solely on its conclusion that the City's amendment was consistent with the policy of RCW 90.58.020. Samson further alleges that the Board and trial court erred when they determined that neither Ecology's former guidelines nor its new guidelines applied because they were not applicable when Ecology approved the amendment.

¶15 It is well-settled law in Washington that public agencies must follow their own rules and regulations. *Skamania County v. Woodall*, 104 Wn. App. 525, 539, 16 P.3d 701, *review denied*, 144 Wn.2d 1021 (2001), *cert. denied*, 535 U.S. 980 (2002). Here, Ecology concluded that the amendment provided "optimum implementation of the policy of the SMA to satisfy the statewide interest." 2 AR

tab 30, at 800. It further indicated that Ecology complied with the procedural requirements for state review and approval of shoreline master program amendments as set forth in WAC 173-26-120 and that Ecology found the amendment consistent with the policy of RCW 90.58.020.

¶16 The record here supports that Ecology's new guidelines did not become effective until January 17, 2004. The City submitted its amendment to Ecology for approval in September 2003, before Ecology had adopted the new guidelines. The new guidelines were not in effect when the City considered the amendment in the summer of 2003, nor when it passed the ordinance on September 10, 2003. As such, we hold that Ecology did not have any *applicable* guidelines at the relevant time to consider. Instead, Ecology made written findings and conclusions regarding the consistency of the proposal with the policy of RCW 90.58.020, as required by RCW 90.58.020. This is consistent with the well-known rule that we will uphold an agency's interpretation of its own regulations as long as that interpretation is plausible and not contrary to legislative intent, *Pitts v. Dep't of Soc. & Health Servs.*, 129 Wn. App. 513, 523, 119 P.3d 896 (2005), as well as the rule that we do not apply statutes retroactively unless they are merely procedural or remedial. *In re F.D. Processing, Inc.*, 119 Wn.2d 452, 462-63, 832 P.2d 1303 (1992).

¶17 Samson contends that Ecology was required to apply its new, proposed, draft guidelines because Ecology proposed the guidelines before the City passed the amendment. This is illogical because there would be no guarantee that the adopted guidelines would contain the same language and requirements. This illogical assertion would force any applicants to wait for Ecology to adopt new guidelines because, otherwise, the City's public comment hearings would occur before the City or the public knew which ordinances could possibly pass muster under Ecology's new guidelines. This would require the City to start the entire process, including public hearings, over again. Accordingly, we do not consider Samson's argument regarding

whether the ordinance was consistent with guidelines that were not yet in effect when the City adopted the ordinance.

## II. Consistency with SMA Policies

¶18 Samson contends that the amendment is not consistent with SMA policies because RCW 90.58.020 requires the City to plan for and foster all reasonable and appropriate uses. The Board and the trial court both found the amendment consistent with the SMA. We review the Board's determination and will grant relief only if we determine that a person seeking judicial relief has been substantially prejudiced. RCW 34.05.570(1)(d). Under RCW 34.05.570(3)(d), we grant relief if we determine that the agency erroneously interpreted or applied the law.

¶19 "The SMA does not prohibit development of the state's shorelines, but calls instead for 'coordinated planning . . . recognizing and protecting private property rights consistent with the public interest,' " *Nisqually Delta Ass'n v. City of DuPont*, 103 Wn.2d 720, 726, 696 P.2d 1222 (1985) (alteration in original) (quoting RCW 90.58.020). Additionally,

> The SMA embodies a legislatively-determined and voter-approved balance between protection of state shorelines and development. The state has developed shorelines through improvement of parks and ramps, construction of bulkheads, ferry docks, etc. As part of our careful management of shorelines, property owners are also allowed to construct water-dependent facilities such as single-family residences, bulkheads, and docks.

*Biggers*, 162 Wn.2d at 697.

¶20 Samson contends that the City's amendment failed to satisfy this required balance. Samson argues that the amendment "completely eliminates private docks—the most fundamental water-dependent use—from an entire harbor of the City under the guise of preserving the aquatic environment." Br. of Appellant at 28. Under RCW

90.58.190(2)(c), "the board shall uphold the decision by the department unless the board, by clear and convincing evidence, determines that the decision of the department is inconsistent with the policy of RCW 90.58.020 and the applicable guidelines."

¶21 The City counters that we must construe the SMA broadly in order to protect Washington shorelines as fully as possible.

The legislature declares that the interest of all of the people shall be paramount in the management of shorelines of statewide significance. The department, in adopting guidelines for shorelines of statewide significance, and local government, in developing master programs for shorelines of statewide significance, shall give preference to uses in the following order of preference which:

(1) Recognize and protect the statewide interest over local interest;

(2) Preserve the natural character of the shoreline;

(3) Result in long term over short term benefit;

(4) Protect the resources and ecology of the shoreline;

(5) Increase public access to publicly owned areas of the shorelines;

(6) Increase recreational opportunities for the public in the shoreline;

(7) Provide for any other element as defined in RCW 90.58.100 deemed appropriate or necessary.

RCW 90.58.020.

¶22 The City contends that both Ecology and the City focused on these provisions when they determined that the amendment satisfied the SMA and conformed to its policies. Specifically, the City claims that its amendment promotes the public's opportunity to enjoy Blakely Harbor's unique aesthetic qualities, protects the public interest in navigation, and fulfills the requirement that " the interest of all of the people shall be paramount when managing shorelines of statewide significance." Br. of Resp't (City) at 21-22. It claims that the amendment provides the proper preference

as required by RCW 90.58.020: (1) recognizing statewide interest over local interest, (2) preserving the natural character of Blakely Harbor, (3) resulting in long-term over short-term benefit, (4) protecting Blakely Harbor's resources and ecology, (5) increasing access to publicly owned areas, and (6) increasing recreational opportunities for the public.

¶23 In response to Samson's argument that the City failed to protect the balance that the *Biggers* court described, the City contends that the amendment does not prohibit all development in Blakely Harbor. It does not even prohibit all docks in the harbor; it allows two new community docks, one new public dock, bulkheads, floats, and mooring buoys. Accordingly, the City contends that it determined the appropriate balance between shoreline use and protection.

¶24 The City further contends that Samson ignores the SMA policies that govern shorelines of statewide significance by placing greater emphasis on shoreline protection and the public interest than on private property or private recreational activities. The City alleges that *Weden v. San Juan County*, 135 Wn.2d 678, 697, 958 P.2d 273 (1998), supports that it is appropriate to favor "the resources and ecology of the shoreline" over "recreational interests." Br. of Resp't (City) at 24. In *Weden*, San Juan County's board of commissioners adopted an ordinance banning personal watercraft on all the county's marine waters and on one of its lakes. *Weden*, 135 Wn.2d at 684. The *Weden* court addressed whether this ordinance conflicted with general laws, but the court also considered whether the ordinance conformed to the SMA. *Weden*, 135 Wn.2d at 696. After analyzing language in RCW 90.58.020 that states, "This policy is designed to insure the development of these shorelines in a manner which, while *allowing for limited reduction of rights of the public in the navigable waters*, will promote and enhance the public interest," the *Weden* court found that the personal watercraft ban was consistent with the SMA. *Weden*, 135 Wn.2d at 696.

¶25 The City also cites our decision in *Lund v. Department of Ecology*, 93 Wn. App. 329, 337, 969 P.2d 1072 (1998), where we considered a denial of a conditional use permit for an over-water residence. The appellant there argued that Tacoma's shoreline master program violated the SMA because it did not protect his private property rights. *Lund*, 93 Wn. App. at 336. We held that, contrary to the appellant's claims that RCW 90.58.020 states a policy of protecting private property rights, that the private property rights are "secondary to the SMA's primary purpose, which is 'to protect the state shorelines as fully as possible.'" *Lund*, 93 Wn. App. at 336-37 (quoting *Buechel*, 125 Wn.2d at 203).

¶26 Samson nevertheless faults the Board for determining that private residential docks are not a preferred use under the SMA. Samson cites *Caminiti v. Boyle*, 107 Wn.2d 662, 673-74, 732 P.2d 989 (1987), *cert. denied*, 484 U.S. 1008 (1988), as evidence that dock construction under the SMA is a beneficial use of the state's shorelines.

> The statute under review expresses a part of that policy; it is a practical recognition that one of the many beneficial uses of public tidelands and shorelands abutting private homes is the placement of private docks on such lands so homeowners and their guests may obtain recreational access to navigable waters.

*Caminiti*, 107 Wn.2d at 673-74. *Caminiti* involved a constitutional challenge to former RCW 79.90.105 (1983),[4] which allowed owners of residential property abutting state-owned tidelands and shorelands to install and maintain private recreational docks on such lands without payment to the State. *Caminiti*, 107 Wn.2d at 663.

¶27 Samson acknowledges the *Caminiti* court's finding that dock construction is "subject to substantial regulation and control." Br. of Appellant at 29; *Caminiti*, 107 Wn.2d at 671. But Samson contends that the SMA permit system adequately meets this need and that there is no demon-

---

[4] *Recodified as* RCW 79.105.430 by LAWS OF 2005, ch. 155, § 106.

strated need for an outright ban on private docks in Blakely Harbor.

¶28 The City counters that RCW 90.58.020 indicates otherwise. That statute provides:

In the implementation of this policy the public's opportunity to enjoy the physical and aesthetic qualities of natural shore-lines of the state shall be preserved to the greatest extent feasible consistent with the overall best interest of the state and the people generally. To this end uses shall be preferred which are consistent with control of pollution and prevention of damage to the natural environment, or are unique to or dependent upon use of the state's shoreline. Alterations of the natural condition of the shorelines of the state, in those limited instances when authorized, shall be given priority for single family residences and their appurtenant structures, ports, shoreline recreational uses including but not limited to parks, marinas, piers, and other improvements facilitating public access to shorelines of the state, industrial and commercial developments which are particularly dependent on their loca-tion on or use of the shorelines of the state and other develop-ment that will provide an opportunity for substantial numbers of the people to enjoy the shorelines of the state.

RCW 90.58.020; Br. of Resp't (City) at 26-27.

¶29 The City contends that neither the SMA's refer-ence to "single-family residences and their appurtenant structures," nor to "shoreline recreational uses including . . . piers, and other improvements facilitating public access to the shorelines of the state" means that the SMA gives special preference to use of shorelines for private single-family residential docks. Br. of Resp't (City) at 27. A Shorelines Hearings Board decision from 1998, *Spencer v. City of Bainbridge Island*, No. 97-43 (Wash. Shoreline Hr'gs Bd. Feb. 5, 1998), which involved a permit application for a boathouse, provides:

First, we note that there is no express reference in the SMA, which would give a priority to boathouses. Second, the refer-ence in RCW 90.58.020, to single-family residential uses and their appurtenant structures, does not specifically list docks or

piers. Piers are listed however, as a preferred use, under improvements which facilitate public access to the state's shorelines. We conclude that the Legislature purposefully distinguished between public and private piers and did not apply any particular preference to the latter, which would limit public access in, rather than promote public access to the waters of the state.

Under this analysis, only recreational uses that facilitate public access to shorelines are priority uses. We defer to the Shorelines Hearings Board on this matter and conclude that our legislature did not intend any special preference for private docks.

¶30 Samson next contends that Blakely Harbor's status as a shoreline of statewide significance under RCW 90.58-.030 does not justify an outright private dock ban.

> Designation of a shoreline as of "state-wide significance" does not prevent all development. That designation provides greater procedural safeguards, but permits limited alteration of the natural shorelines, with priority given to "residences, ports, shoreline recreational uses including . . . industrial and commercial developments which are particularly dependent on their location on or use of the shorelines of the state."

*Nisqually*, 103 Wn.2d at 726 (alteration in original) (quoting RCW 90.58.020). Again, Samson argues that the SMA permit procedure adequately addresses this concern.

¶31 But Samson provides no authority from the SMA or elsewhere that requires the City to allow docks on every shoreline. As mentioned above, the amendment here does not prohibit all development in Blakely Harbor, nor does it prohibit all docks in the harbor. Instead, the City chose to allow buoys, bulkheads, and floats, in addition to allowing two community docks that would handle up to five boats each and one public dock. We hold that the Board did not erroneously interpret or apply the law and that Samson failed to show prejudice.

### III. CONSISTENCY WITH CITY SMP AND COMPREHENSIVE PLAN

¶32 Samson next contends that the amendment is inconsistent with the City's SMP and Comprehensive Plan policies. Samson argues that the City's amendment must comply with the internal consistency provisions of RCW 36.70A.040(4)[5] and RCW 36.70A.070[6] (the Growth Management Act).

¶33 Samson claims that before the City adopted the amendment, its SMP allowed private docks in all but the most protective shoreline designation, "Natural" and "Aquatic Conservancy." 2 AR tab 30, at 802. The City designated Blakely Harbor as semirural, which would allow dock construction.

¶34 Samson argues that no SMP policies support the City's amendment because the SMP goals and policies give preference to water-dependent and water-related uses. Specifically, the "Master Goal" of the City's SMP provides:

> The City's shorelines are among the most valuable, scarce, and fragile of our natural resources that provide a significant part of our way of life as a place of residence, recreational enjoyment, and occupation. It is the intent of this program to manage the shorelines of Bainbridge Island, giving preference to water-dependent and water-related uses, and to encourage development and other activities to co-exist in harmony with the natural conditions. Uses that result in long-term over short-term benefits are preferred, as are uses which promote sustainable development.

---

[5] RCW 36.70A.040(4) provides:

Any county or city that is required to conform with all the requirements of this chapter . . . shall take actions under this chapter as follows: . . . (d) the county and each city that is located within the county shall adopt a comprehensive plan and development regulations that are consistent with and implement the comprehensive plan.

[6] RCW 36.70A.070 provides:

The comprehensive plan of a county or city that is required or chooses to plan under RCW 36.70A.040 shall consist of a map or maps, and descriptive text covering objectives, principles, and standards used to develop the comprehensive plan. The plan shall be an internally consistent document.

3 AR tab 35, at 1189. Under the section titled "Shoreline Use Element," the City listed as a goal to "[i]dentify and preserve shoreline and water areas with unique attributes for specific long-term uses, including . . . residential [and] recreational . . . uses." 3 AR tab 35, at 1189. Samson further argues that the amendment is inconsistent with the SMP policy to "[e]nsure that proposed shoreline uses give consideration to the rights of private property ownership and the rights of others." 3 AR tab 35, at 1189; Br. of Appellant at 34.

¶35 The City responds that the very "Master Goal" and "Shoreline Use Element" that Samson cites provide support for the amendment because the amendment assists in preserving Blakely Harbor as a scarce natural resource with unique attributes, it promotes long-term recreational enjoyment of the harbor, and it protects against adverse impacts to navigation and views. Br. of Resp't (City) at 51-52.

¶36 The City further cites multiple SMP policies as consistent with the amendment. The policies the City listed in the SMP for piers, docks, recreational floats, and mooring buoys include:

Policies

1. Multiple use and expansion of existing conforming piers, docks, and floats should be encouraged over the addition and/or proliferation of new facilities. Joint use facilities are preferred over new, single-use piers, docks, and floats.

2. The use of mooring buoys should be encouraged in preference to either piers or docks.

3. Piers, docks, and floats should be designed to cause minimum interference with navigable waters, the public's use of the shoreline, and views from adjoining properties.

4. Piers, floats, and docks should be sited and designed to minimize possible adverse environmental impacts, including potential impacts on littoral drift, sand movement, water circulation and quality, and fish and wildlife habitat.

. . . .

8. The proposed size of the structure and intensity of use or uses of any dock, pier, and/or float should be compatible with the surrounding environment and land and water uses.

3 AR tab 35, at 1282.

¶37 As the City correctly points out, the amendment requires joint-use dock facilities in Blakely Harbor and the use of mooring buoys instead of docks. The amendment protects against interference with navigable waters, protects the public's use of the shoreline, protects views from adjoining property, and minimizes adverse environmental impacts. Further, the amendment does not prevent all or even most uses of the private properties; it simply limits one type of structure in Blakely Harbor. Finally, although Samson does not address it, section five of the former SMP provides, "Piers and docks may be limited in length or prohibited, where necessary, to protect navigation, public use, or habitat values." 2 AR tab 30, at 804. We hold that Samson failed to establish the amendment as inconsistent with the SMP or comprehensive plan.

## IV. SUBSTANTIAL EVIDENCE FOR BOARD'S DECISION

¶38 Samson next contends that substantial evidence failed to support the Board's decision that the amendment is consistent with Ecology's new guidelines. Although we do not examine the amendment's consistency with the new guidelines, we do address substantial evidence with regard to the applicable statutes and WAC provisions. Samson argues that WAC 173-26-090 provides that local governments can amend their SMPs when "deemed necessary to reflect changing local circumstances, new information or improved data." Br. of Appellant at 35. Under RCW 34.05.570(3)(e), this court grants relief only if

[t]he order is not supported by evidence that is substantial when viewed in light of the whole record before the court, which includes the agency record for judicial review, supplemented by any additional evidence received by the court under this chapter.

Substantial evidence is "a sufficient quantity of evidence to persuade a fair-minded person of the truth or correctness of the order." *Callecod v. Wash. State Patrol*, 84 Wn. App. 663, 673, 929 P.2d 510, *review denied*, 132 Wn.2d 1004 (1997). WAC 173-26-090 is not a part of the new Ecology guidelines and, thus, we consider this portion of Samson's argument. It provides:

> Each local government should periodically review a shoreline master program under its jurisdiction and make amendments to the master program deemed necessary to reflect changing local circumstances, new information or improved data.

WAC 173-26-090. Further, RCW 90.58.100 provides:

> (1) The master programs provided for in this chapter, when adopted or approved by the department shall constitute use regulations for the various shorelines of the state. In preparing the master programs, and any amendments thereto, the department and local governments shall to the extent feasible:
>
> (a) Utilize a systematic interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts;
>
> (b) Consult with and obtain the comments of any federal, state, regional, or local agency having any special expertise with respect to any environmental impact;
>
> (c) Consider all plans, studies, surveys, inventories, and systems of classification made or being made by federal, state, regional, or local agencies, by private individuals, or by organizations dealing with pertinent shorelines of the state;
>
> (d) Conduct or support such further research, studies, surveys, and interviews as are deemed necessary;
>
> (e) Utilize all available information regarding hydrology, geography, topography, ecology, economics, and other pertinent data;
>
> (f) Employ, when feasible, all appropriate, modern scientific data processing and computer techniques to store, index, analyze, and manage the information gathered.

¶39 Initially, Samson contends that the City here had no changing local circumstances, new information, or im-

proved data. Samson challenges that insubstantial evidence supported the finding that Blakely Harbor would suffer adverse cumulative impacts likely to be caused by the proliferation of private dock and pier development within Blakely Harbor, and the "risk of experiencing irreversible development that would adversely impact the public interest in the shorelines of the state." Br. of Appellant at 35-36. Samson faults the Board, the City, and Ecology for relying on the Blakely Harbor cumulative impact assessment as justification for adopting the amendment. Samson contends that this assessment is nothing more than general literature about the effects of historic dock construction, or other waterfront developments such as the large seawall at Lincoln Park, in Seattle. But as RCW 90.58.100(1)(a) requires, the assessment appears to use all available information and modern computer techniques to assess the cumulative impacts of dock construction in the harbor.

¶40 Samson contends that no changing local circumstances existed, but the record supports that although Blakely Harbor remains possibly the least developed harbor in all of Central Puget Sound, that development pressure for subdivisions, docks, and building permits has increased. Letters and testimony in the record indicate interest of the Blakely Harbor property owners to construct docks.

¶41 The assessment estimated a maximum number of 59 docks based on the possibility of 307 potential residences. While acknowledging that the maximum number was likely overestimated, the City assigned a predicted number of docks at 45, based on 94 likely residences.

¶42 In preparing its assumptions, the City developed three geographic information system (GIS) models, the first of which it based on existing development. The City developed its GIS models using the most recent numbers available in the Kitsap County assessor GIS database. The City based its maximum numbers on known parcel restrictions, including zoning densities, steep slopes, streams, known

wetlands, shoreline native vegetation zones, known restrictive covenants and easements, and existing regulations. We note that the increase in expected dock construction slows as the number of residences increases because of joint-use docks, which the City would have to require due to challenging topography, critical areas, rights-of-way, and the presence of existing marina facilities.

¶43 The City relied on the following assumptions to determine the predicted numbers: lot size along the harbor, Blakely Harbor Park's lack of dock facilities, the inability to develop some lots due to size and relationship (septic, yard), joint-use requirements for subdivisions, Seattle Country Club's decision not to subdivide, and dock density. In considering the dock density, the City noted that Bainbridge Island's three other residential harbors have an average of 60 percent dock to developed parcel ratio. The assessment concluded that the predicted build-out scenario, which the City considers most likely, "presents a significant change to the character, navigational use, and natural resources of Blakely Harbor when considered cumulatively." 2 AR tab 30, at 417-18. We hold that substantial evidence supported the City's use of its assessment.

¶44 Samson next contends that substantial evidence does not support the assessment's conclusion about view impacts. Samson faults the assessment for failing to include statistics about kayak or canoe numbers in the harbor, as well as the failure to consider that boaters can see through, under, and over docks. But the record does not support his contention.

¶45 The assessment evaluated view impacts from public vistas and view corridors, including Blakely Harbor Park, Seaborn Road, and three sites along Country Club Road. The assessment notes that docks affect views more than floats because they are fixed. View reductions or narrowing varied from less than 10 percent on Seaborn Road to 78 percent on the western vista of Country Club Road. Substantial evidence supported this finding.

¶46 Samson next faults the assessment's conclusion regarding natural resources, aquatic life, and aquatic habitat. The assessment listed 11 species of amphibians, 6 species of reptiles, 200 species of birds, and 49 species of mammals in the Blakely Harbor area. The Blakely Harbor also includes eelgrass beds. The assessment determined that docks could lead to loss of benthic habitat; animal and plant injury/ mortality; increased turbidity; light reduction; ambient light pattern alteration; noise disturbance; altered wave energy patterns; increased exotic species, toxics, nutrients, and bacterial introductions; and alteration of water quality.

¶47 We hold that substantial evidence supported the Board's determination that the amendment satisfied the requirements of WAC 173-26-090 and RCW 90.58.100.

## V. PUBLIC TRUST DOCTRINE

¶48 Samson next contends that the amendment violates the public trust doctrine. We presume that ordinances are constitutional and place a heavy burden on the party challenging the ordinance to prove otherwise. *Brown v. City of Yakima*, 116 Wn.2d 556, 559, 807 P.2d 353 (1991).

> According to the public trust doctrine, the State holds state shorelines and waters in trust for the people of Washington, and " '[t]he state can no more convey or give away this jus publicum[7] interest than it can abdicate its police powers in the administration of government and the preservation of the peace.' "

*Lake Union Drydock Co. v. Dep't of Natural Res.*, 143 Wn. App. 644, 658, 179 P.3d 844 (2008) (quoting *Biggers*, 162 Wn.2d at 696 (quoting *Caminiti*, 107 Wn.2d at 669)).

¶49 Samson argues that the amendment prohibits what the *Caminiti* court allowed: public access to the waters of the state through construction of private recre-

---

[7] "Jus publicum" refers to the principle that the public has an overriding interest in the navigable waterways and the lands under them. *Caminiti*, 107 Wn.2d at 668.

ational docks by abutting waterfront property owners. Ecology counters that the amendment actually protects the public interest in navigational and recreational use of Blakely Harbor and that Samson misconstrues the public trust doctrine by implying that the doctrine enshrines a right to construct individual, private docks, just because a private property owner *could* use that dock for navigation purposes. We agree with Ecology. Samson's position would turn the jus publicum doctrine on its head. There is no doubt that the amendment protects the public interest in this navigable waterway more so than allowing the construction of multiple docks and piers would.

¶50 The City responds that *Caminiti* does not stand for the proposition that Samson asserts and certainly does not hold or imply that the City must allow private docks on all shorelines. We agree. As discussed above, *Caminiti* involved a challenge to the constitutionality of former RCW 79.90.105, a statute that allowed owners of residential property abutting state-owned tidelands and shorelands to install and maintain private recreational docks on such lands without payment to the state. *Caminiti*, 107 Wn.2d at 663. Under article XVII, section 1 of the Washington Constitution, the State has authority to transfer ownership of shorelands, subject to the paramount public right in the shorelands. *Caminiti*, 107 Wn.2d at 667. The paramount public interest includes the right

> "of navigation, together with its incidental rights of fishing, boating, swimming, water skiing, and other related recreational purposes generally regarded as corollary to the right of navigation and the use of public waters."

*Caminiti*, 107 Wn.2d at 669 (quoting *Wilbour v. Gallagher*, 77 Wn.2d 306, 316, 462 P.2d 232, *cert. denied*, 400 U.S. 878 (1970)). The public trust doctrine emanates from this public authority interest in the shorelands. *Orion Corp. v. State*, 109 Wn.2d 621, 640, 641, 747 P.2d 1062 (1987), *cert. denied*, 486 U.S. 1022 (1988). The two-part test the *Caminiti* court applied was "(1) whether the State, by the questioned legislation, has given up its right of control over the jus

publicum and (2) if so, whether by so doing the State (a) has promoted the interests of the public in the jus publicum, or (b) has not substantially impaired it." *Caminiti*, 107 Wn.2d at 670. Before applying the test, the *Caminiti* court recognized that the SMA satisfies the public trust doctrine. *Caminiti*, 107 Wn.2d at 670.

¶51 Samson does not explain how the amendment in question here does not satisfy this test. Instead, Samson seems to be arguing that the specific facts and the result of *Caminiti*, that a statute allowing private docks without a fee to the state does not offend the public trust doctrine, means that the amendment offends the doctrine. We hold that Samson fails to establish that the amendment disposes of the state's interest in such a way as to impair the public's right of access and, thus, the amendment does not offend the public trust doctrine.

## VI. ARTICLE XI, SECTION 11

¶52 Next, Samson contends that the amendment offends article XI, section 11 of the Washington Constitution because the amendment prohibits that which a statute expressly authorizes. Samson bases this argument on the allegation that the SMA considers private docks for single-family uses as a priority under WAC 173-26-231(3)(b). We do not address this argument because it is dependent on a WAC section from Ecology's new guidelines, which we have held were not applicable to this matter.

## VII. DUE PROCESS AND EQUAL PROTECTION

¶53 Samson next contends that the amendment violates due process and equal protection rights. The test for substantive due process violations is

(1) whether the regulation is aimed at achieving a legitimate public purpose; (2) whether it uses means that are reasonably necessary to achieve that purpose; and (3) whether it is unduly oppressive on the landowner.

*Presbytery of Seattle v. King County*, 114 Wn.2d 320, 330, 787 P.2d 907, *cert. denied*, 498 U.S. 911 (1990). Failure to meet any of these prongs violates due process. *Presbytery*, 114 Wn.2d at 331-32. We examine several nonexclusive factors to determine whether a regulation is unduly oppressive, such as the nature of the harm, the availability and effectiveness of less drastic measures, and economic loss suffered by the owner. *Presbytery*, 114 Wn.2d at 331.

¶54 Samson contends that the amendment fails the first prong because it is contrary to the SMA's goal of "planning for and fostering all reasonable and appropriate uses" under RCW 90.58.020. As discussed above, the limited dock development in Blakely Harbor advances the public purpose of protecting the harbor's aesthetic, navigational, and recreational values. The amendment is not contrary to the SMA, and Samson has not proved that the amendment fails to satisfy the first prong of the due process analysis.

¶55 Next, Samson argues that the amendment is "grossly excessive for the very reason that it effectively bans the construction of all new [docks] in Blakely Harbor" and the City and Ecology cannot explain why such a limitation is needed in Blakely Harbor as opposed to other harbors. Br. of Appellant at 45. Ecology responds that the limitation is not a ban on all docks, merely single-family private docks, and that the amendment allows the use of floats, bulkheads, and two community docks for the local residents. We agree with Ecology.

¶56 Samson further contends that the amendment places an undue burden on private property owners in Blakely Harbor. Specifically, Samson argues that the amendment requires property owners to shoulder the burden for whatever environmental ills the City and Ecology seek to avoid with the dock limitation. Samson claims, "Anyone who owns or controls shoreline property, or who frequents the shorelines for recreational or other reasons, will have an impact on the shoreline environment." Br. of Appellant at 45. But the record reveals that the purpose of the

amendment was to protect the aesthetic, navigational, and recreational values that would be diminished by multiple docks in the harbor. Under *Weden*, "It defies logic to suggest an ordinance is unduly oppressive when it regulates only the activity which is directly responsible for the harm." *Weden*, 135 Wn.2d at 707.

¶57 Samson claims that the City could have used less drastic alternatives such as its existing dock permit system, new design standards such as mandatory length requirements or joint dock use, or even a cap on the number of docks in the harbor. It is unclear from the record whether any of these other alternatives would be effective or less burdensome to property owners than the dock limitation.

¶58 Samson alleges that the amendment subjects property owners to a significant loss in value. Samson presented no evidence of any decrease in property value or of any other hardship the amendment caused. We hold that Samson's substantive due process claim fails.

¶59 Samson claims that the amendment violates equal protection rights because it treats semirural property in Blakely Harbor differently from other harbors on Bainbridge Island. To show a violation of the equal protection clause under the Fourteenth Amendment to the United States Constitution and article I, section 12 of the Wasington Constitution, a party must establish that the challenged law treats unequally two similarly situated classes of people. *Fell v. Spokane Transit Auth.*, 128 Wn.2d 618, 635, 911 P.2d 1319 (1996). In the absence of any argument that the challenged ordinance violates a fundamental right or inclusion in a suspect class, rational basis review applies. *Tunstall v. Bergeson*, 141 Wn.2d 201, 226, 5 P.3d 691 (2000), *cert. denied*, 532 U.S. 920 (2001).

¶60 Under rational basis review, we determine whether (1) the governmental action applies alike to all members within the designated class, (2) there are reasonable grounds to distinguish between those within and those without the class, and (3) the classification has a rational relationship to the legislative purpose. *Convention Ctr.*

*Coal. v. City of Seattle*, 107 Wn.2d 370, 378-79, 730 P.2d 636 (1986). We will not hold an ordinance unconstitutional under a rational review basis unless it rests on grounds "wholly irrelevant to the achievement of a legitimate state objective." *Nielsen v. Wash. State Bar Ass'n*, 90 Wn.2d 818, 820, 585 P.2d 1191 (1978). Concerning the third prong, a classification must be "purely arbitrary" to overcome the strong presumption of constitutionality. *Thurston County Rental Owners Ass'n v. Thurston County*, 85 Wn. App. 171, 186, 931 P.2d 208 (citing *State v. Smith*, 117 Wn.2d 263, 279, 814 P.2d 652 (1991)), *review denied*, 132 Wn.2d 1010 (1997).

▆▆▆▆ ¶61 Samson's argument is simply that there is no rational basis for treating waterfront property owners in Blakely Harbor with a "semi-rural" designation differently from waterfront property owners in other areas of the City with the same designation. Br. of Appellant at 43. But the City did determine that Blakely Harbor, because of its status as a relatively undeveloped shoreline with high recreational values, should be preserved to the maximum extent possible from pier and dock development.

> New dock development should be limited in Blakely Harbor because it is the least developed harbor in Central Puget Sound and is prized by the Bainbridge Island community and residents throughout Washington State for its scenic beauty, unique rocky shoreline, and navigable water. . . . Blakely Harbor is also prized by fish and wildlife for its diversity of habitats and lack of overwater structures. In fact, part of the harbor had been previously proposed as a marine protected area and is a popular dive site because of the ecological diversity and abundance there.

2 AR tab 30, at 674.

¶62 We hold that the amendment applies alike to all members within the designated class (Blakely Harbor property owners), there are reasonable grounds to distinguish between Blakely Harbor and the other harbors in the City, and the amendment has a rational relationship to the legislative purpose, and the recreational, aesthetic, and

natural resource values of the harbor. *Convention Ctr. Coal.*, 107 Wn.2d at 378-79.

## VIII. SUPPLEMENTATION OF THE RECORD

¶63 Finally, Samson contends that the trial court erred by denying its request to supplement the administrative record. After Samson filed its appeal with the trial court, Samson filed motions to supplement the record with the deposition transcripts and affidavit of Peter Best, the planner that prepared the City's assessment. APA judicial review is limited to the record before the agency, RCW 34.05.566(1). *Wash. Indep. Tel. Ass'n v. Wash. Utils. & Transp. Comm'n*, 110 Wn. App. 498, 518, 41 P.3d 1212 (2002), *aff'd*, 149 Wn.2d 17, 65 P.3d 319 (2003). RCW 34.05.562 provides:

(1) The court may receive evidence in addition to that contained in the agency record for judicial review, only if it relates to the validity of the agency action at the time it was taken and is needed to decide disputed issues regarding:

(a) Improper constitution as a decision-making body or grounds for disqualification of those taking the agency action;

(b) Unlawfulness of procedure or of decision-making process; or

(c) Material facts in rule making, brief adjudications, or other proceedings not required to be determined on the agency record.

(2) The court may remand a matter to the agency, before final disposition of a petition for review, with directions that the agency conduct fact-finding and other proceedings the court considers necessary and that the agency take such further action on the basis thereof as the court directs, if:

(a) The agency was required by this chapter or any other provision of law to base its action exclusively on a record of a type reasonably suitable for judicial review, but the agency failed to prepare or preserve an adequate record;

(b) The court finds that (i) new evidence has become available that relates to the validity of the agency action at the time

it was taken, that one or more of the parties did not know and was under no duty to discover or could not have reasonably been discovered until after the agency action, and (ii) the interests of justice would be served by remand to the agency;

(c) The agency improperly excluded or omitted evidence from the record; or

(d) A relevant provision of law changed after the agency action and the court determines that the new provision may control the outcome.

We reverse a denial to supplement the record only if it determines that there was manifest abuse of discretion. *Okamoto v. Employment Sec. Dep't*, 107 Wn. App. 490, 494-95, 27 P.3d 1203 (2001), *review denied*, 145 Wn.2d 1022 (2002).

¶64 Samson requested to add the deposition testimony and affidavit to show that the numbers the assessment predicts, between 45 and 59 new docks in Blakely Harbor, are unreasonable and unlikely. Samson also contends that the new evidence is necessary to resolve disputed issues regarding whether the amendment is consistent with the new guidelines. This deposition testimony and affidavit were taken in a different case filed in federal court based on claims for damages against the City due to the earlier shoreline moratorium.

¶65 As an initial matter, the requested documents allegedly address the validity of the amendment with regard to consideration and application of WAC 173-26-186, but as discussed above, the new guidelines did not apply to the amendment. Regardless, Samson is unable to show that the trial court erred by denying the request. Samson fails to inform us which of the three exceptions applies to their evidence. Further, Samson cannot satisfy RCW 34.05-.562(2) because there is no evidence that one or more of the parties did not know and was under no duty to discover the evidence until after the agency action. We hold that the

trial court did not abuse its discretion when it denied Samson's request to supplement the agency record.

¶66 Affirmed.

PENOYAR, A.C.J., and QUINN-BRINTNALL, J., concur.

Review denied at 166 Wn.2d 1036 (2009).